[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 09-11153
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
FEB 24, 2011
JOHN LEY
CLERK

D. C. Docket No. 07-23066-CV-UU

MOLINOS VALLE DEL CIBAO, C. por A.,
a corporation of the Dominican Republic,

Plaintiff-Appellant,

versus

OSCAR R. LAMA,
CARLOS LAMA-SELIMAN,
OSCAR LAMA-SELIMAN, individuals
residing in the state of Florida,

Defendants-Appellees.

_____

No. 09-12587
_____

D.C. Docket No. 07-23066-CV-UU

MOLINOS VALLE DEL CIBAO, C. por A.,
a corporation of the Dominican Republic,

Plaintiff-Appellee,

versus

OSCAR R. LAMA,
CARLOS LAMA-SELIMAN,
OSCAR LAMA-SELIMAN, individuals
residing in the state of Florida,

Defendants-Appellants.

———————————————

Appeals from the United States District Court
for the Southern District of Florida

———————————————

(February 24, 2011)

Before TJOFLAT and COX, Circuit Judges, and KORMAN,[*] District Judge.

TJOFLAT, Circuit Judge:

This case stems from a foreign currency exchange agreement. The plaintiff, a foreign corporation, bought United States dollars from the defendants, three individuals—two of whom it turns out are citizens of the Dominican Republic—in exchange for Dominican pesos. The plaintiff paid and the defendants did not; the plaintiffs sued. What was otherwise a simple state law breach of contract action

---

[*] Honorable Edward R. Korman, United States District Judge for the Eastern District of New York, sitting by designation.

became much more complicated by inartful lawyering and the allure of treble damages.

The defendants challenged subject matter jurisdiction at late junctures—on the eve of trial for one theory, on appeal for another—regarding issues they could have foreseen when they received the complaint over three years ago. The plaintiff, after being fully compensated under its breach of contract theory, contests the district court's dismissal of its statutory worthless check claim, Fla. Stat. § 68.065. Under both claims the plaintiff would receive the same compensatory damages; the dismissed claim, however, provides prevailing plaintiffs with treble damages.

This opinion is organized as follows. Part I lays out the facts of the case and its procedural history. Part II discusses the three issues related to subject matter jurisdiction, and concludes that we have jurisdiction to hear the merits arguments regarding one defendant. Part III addresses the plaintiff's two arguments regarding piercing the corporate veil—a necessary component for the worthless check claim. Part IV addresses the remaining defendant's two arguments: that the district court erroneously admitted communications made during settlement negotiations; and that there was insufficient evidence to show

3

that the currency broker who negotiated the contract was the defendant's agent. Part V concludes.

## I.

## A.

This case stems from a Foreign Currency Exchange Agreement ("the Contract") between the plaintiff, Molinos Valle Del Cibao, C. por A. ("Molinos"), and the three defendants (collectively, the "Lamas"), Oscar R. Lama ("Oscar Sr.") and his two sons, Carlos Lama Seliman ("Carlos") and Oscar Lama Seliman ("Oscar Jr."). Molinos is a Dominican corporation. The Lamas themselves reside in Florida. Facts brought forward in supplemental briefing to this court show that Oscar Sr. is a dual citizen of the United States and the Dominican Republic, but that Carlos and Oscar Jr. are Dominican citizens working in the United States on non-immigrant worker visas.

Molinos operates a flour mill, selling flour to the Dominican market, for which it receives Dominican pesos. Its suppliers, however, are often American companies; Molinos must pay their bills in United States dollars. To get the best exchange rate for its pesos, Molinos often hires currency brokers to find and contract with sellers of United States dollars.

In June 2004, Molinos needed to exchange approximately 28 million pesos for United States dollars to pay its suppliers. It hired a currency broker named Marcia Gabriela Bonnelly to find the best rate. To that end, she contacted Juan Mejia, another currency broker. One of Mejia's clients, the Lama family, was looking to sell United States dollars. Mejia contacted one of the Lamas, Carlos, who approved the Contract: 28 million Dominican Pesos for $636,596.00.

Molinos completed its side of the Contract; it drafted checks worth 28 million pesos and gave them to Bonnelly, who passed them on to Mejia.[1] The checks were not, however, made payable to any member of the Lamas family; they were payable to other individuals and another corporation controlled by the Lamas. Mejia testified at trial that this arrangement was normal for his transactions on behalf of the Lamas. The family often needed instant liquidity and therefore often requested that checks be made payable to their messengers, who would then cash the checks on their trip back to the Lamas' office. The checks were honored and the Lamas received their pesos.

In return, Molinos received a series of checks totaling $636,596.00. These checks were drawn from the accounts of two Dominican corporations, Chipstek,

---

[1] The checks were not drafted from Molinos's bank account; they were drafted on behalf of Agronomica Don Pedro, another corporation "related to Molinos." Early in the litigation, the Lamas claimed that Molinos did not have standing to bring this claim because it did not draft the checks in question. The district court rejected this argument and the Lamas do not challenge it on appeal.

5

S.A. ("Chipstek") and Expertek, S.A. ("Expertek"), and signed by either Carlos or Oscar Jr. in their capacity as directors of Chipstek and Expertek. Both Chipstek and Expertek are wholly-owned subsidiaries of Globaltek, S.A. ("Globaltek").[2] Globaltek is owned by ORLS International Holdings, which is in turn owned by L&S Corporation; members of the Lama family, including Oscar Sr., Carlos, and Oscar Jr., own L&S Corporation. The Lamas—Oscar Sr., Carlos, and Oscar Jr.—are board members of Chipstek and Expertek, but do not own these entities directly.

---

[2] It is unclear if this statement is entirely true. The district court noted confusion in the record as to this point. Order on Defs.' Mots. for J. as a Matter of Law 2 n.1. In the district court, Molinos asserted that Chipstek is 99.4 percent owned by Globaltek. Pl.'s Mem. Opp'n to Defs.' Mot. for J. as a Matter of Law, or, in the Alternative, Mot. New Trial or Remittur 13–14 n.9. It is unclear who owns the remaining 0.6 percent. In its reply brief, Molinos asserts that Oscar Sr. "was not a shareholder of Globaltek, Chipstek or Expertek." Appellant's Reply Br. 15. But Oscar Sr.'s deposition testimony read at trial indicates that he owns a token amount of stock, though his testimony does not indicate how much.

For the purposes of this opinion, we will treat Globaltek as if it owned 100 percent of Chipstek's stock and ignore Oscar Sr.'s token interest. We feel comfortable doing this for two reasons. First, this issue is only potentially relevant regarding Molinos's attempt to pierce Chipstek's corporate veil. But Molinos's brief to this court only argues that Oscar Sr. should be liable because he is a director of these companies. Appellant's Reply Br. 10 ("The Law Does Not Require Ownership, it is Sufficient that the Lamas were Directors of Chipstek and Expertek"). Molinos has therefore waived any argument that Oscar Sr.'s token stock ownership should factor into our evaluation of Molinos's veil piercing argument.

Second, a brief investigation into Florida case law suggests that only controlling or majority shareholders may be liable for the corporation's debts under a veil piercing theory. See, e.g., Seminole Boatyard, Inc. v. Christoph, 715 So. 2d 987, 989 (Fla. 4th Dist. Ct. App. 1998) ("If the state's law allows the debtor corporation to assert a claim against a controlling shareholder to pierce its own corporate veil, then the claim is property of the estate." (emphasis added) (citations omitted)); Estudios, Proyectos e Inversiones de Centro America, S.A. v. Swiss Bank Corp., 507 So. 2d 1119, 1120 (Fla. 3d Dist. Ct. App. 1987) ("A corporation's veil will be pierced where the corporation's controlling shareholder formed or used the corporation to defraud creditors by evading liability for preexisting obligations." (emphasis added)). Under this principle, even if Oscar Sr. is a nominal shareholder in either Chipstek or Expertek, only Globaltek, which owns 99 percent of the companies, would be eligible for veil piercing.

6

Although Chipstek and Expertek wrote these checks, Molinos's trial testimony suggests that these corporations were not parties to the Contract. Bonnelly was familiar with the Lamas but had never before done business with these entities. Rather, she testified that the Lamas had a good reputation—"they were responsible morally also and solvent"—in the business community and she had consummated similar currency agreements with the Lamas on behalf of roughly ten to twelve of her other clients. Molinos's General Manager, Ruben Reynoso, who approved the deal on Molinos's behalf, likewise believed that the Lamas were Molinos's contractual counter-party; he had never heard of Chipstek or Expertek. The Lamas' reputation played a role in his approval of the Contract.

This trust was misplaced; the checks bounced. Molinos's bank informed Molinos that the accounts on which the checks were drawn either were overdrawn or had been closed.

Wanting to resolve this issue, Molinos's representatives met with the Lamas on several occasions between August and October 2004. At one of these meetings, Oscar Sr. acknowledged that his family, himself included, was responsible for the sum of the bounced checks.[3] Carlos also acknowledged that

---

[3] This statement comes from Mejia's trial testimony. Although it is unclear when Oscar Sr. said this to Mejia, the reaction of the Lamas' counsel suggests that it was during one of these negotiation meetings; the Lamas objected to its entry under Fed. R. Evid. 408, which generally bars admission of communications during settlement negotiations.

his family—he, Oscar Sr., and Oscar Jr.—was responsible for the debt. At the conclusion of the October 2004 meeting, Carlos signed a settlement agreement acknowledging personal liability for part of the debt and signed a corresponding promissory note.[4] The parties met again in 2006 to discuss the debt, which the Lamas had not yet paid. Oscar Sr. attended that meeting and did not deny his personal liability under the Contract.

Molinos never received its money. Its suppliers, however, still required payment. Several of its checks to these suppliers also bounced; they were issued in reliance on the availability of funds under the Contract. To cover its costs, Molinos had to borrow money, incurring interest.

B.

---

[4] The agreement covered not only a portion of the debt under the Contract, but also released claims pending in court in the Dominican Republic over separate transactions related to bad checks. It is unclear to what extent the negotiations described above covered both grounds—the debt and the Dominican Republic litigation. The district court's order admitting these discussions in evidence suggests that it made a finding that the Lamas' admissions of liability were not made during settlement negotiations surrounding the Dominican Republic litigation; the court permitted the jury to hear these statements but barred admission of "settlement negotiations and documentation regarding the [Dominican Republic] Proceeding."

The settlement agreement also provided a forum selection clause that requires all litigation regarding the Contract to occur in the Dominican Republic. The Lamas did not seek to enforce this clause in the district court and do not raise the issue on appeal.

At trial, the Lamas' counsel raised for the first time a defense of accord and satisfaction based on this settlement agreement. The district court refused to hear evidence on the issue because the Lamas never pled the defense in their answer. They do not appeal this ruling, either.

Molinos brought this suit against the Lamas in November 2007 in the United States District Court for the Southern District of Florida.[5] The amended complaint contained six counts.[6] Count I alleged that the Lamas breached the Contract. Counts II and III alleged fraud and negligent misrepresentation, but were dismissed at the pleading stage and are not challenged here. Count IV alleged a worthless check claim under Fla. Stat. § 68.065 and sought liability directly against the Lamas under the theory that because Chipstek and Expertek, the entities that issued the worthless checks, were the alter egos of the Lamas, the court should pierce the corporate veil. This count is notable because it carries with it the possibility of treble damages. Fla. Stat. § 68.065(1).[7] Count V alleged a violation of the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.204(1). Count VI alleged unjust enrichment, an alternative theory if the court did not find an express contract to sustain Count I.

Regarding jurisdiction, Molinos cited diversity jurisdiction under 28 U.S.C. § 1332(a). Molinos alleged that it was a Dominican citizen and that the Lamas

---

[5] The case was heard before District Judge Ursula Ungaro. The case was initially assigned to District Judge Patricia A. Seitz, but was transferred to Judge Ungaro when Judge Seitz recused on December 3, 2007.

[6] Molinos filed his initial complaint on November 20, 2007, but filed an amended complaint on January 24, 2008.

[7] At oral argument, Molinos's counsel conceded that the reason it appealed the district court's rejection of Count IV was the prospect of treble damages.

were "residents of Florida." The Lamas did not contest diversity jurisdiction; their answer acknowledged that they were "domiciled" in Florida.

Over the next months, the Lamas several times moved the court to dismiss the case. They moved to dismiss the amended complaint on February 7, 2008 for failure to state a claim for relief under Federal Rule of Civil Procedure 12(b)(6).[8] The court granted this motion in part and dismissed Counts II and III, but denied the rest of the motion. On August 25, 2008, the Lamas moved for judgment on the pleadings under Rule 12(c); the court denied this motion. The Lamas also moved for summary judgment under Rule 56 on all claims on August 26, 2008; this motion was also denied.

The Lamas filed a motion in limine on October 3, 2008. Pertinent to this appeal, the motion sought to exclude the promissory note signed by Carlos and any statements made during the purported settlement discussions during 2004 and 2006. The district court denied the motion. It held that, because the Lamas never denied either the validity or the amount of Molinos's claim during those negotiations, the negotiations were not covered by Federal Rule of Evidence 408.

---

[8] The Lamas also moved to dismiss the amended complaint for insufficient service of process under Rule 12(b)(5) and for forum non conviens. The district court denied the Lamas' motion on these grounds as well.

This opinion references two sets of rules: the Federal Rules of Civil Procedure and the Federal Rules of Evidence. We will refer any Federal Rule of Civil Procedure simply as a "Rule" and any Federal Rule of Evidence as an "Evidence Rule."

At trial, the court instructed the jury that the evidence was not being offered to show liability—i.e., that the Lamas' conduct breached the contract—but rather to show that the Lamas, as opposed to Chipstek or Expertek, were Molinos's true counter-parties.

On January 20, 2009, the day before the trial began, the Lamas moved to dismiss the case on two grounds: (1) for lack of subject matter jurisdiction under Rule 12(b)(1) because all parties were aliens; and (2) for failure to join an indispensable party under Rule 12(b)(7). They argued that, because Chipstek and Expertek issued the checks and were therefore the "primary actors," their Dominican citizenship should be imputed to the Lamas, thereby destroying alienage jurisdiction under 28 U.S.C. § 1332(a)(2) because Molinos, an alien, would be suing the Lamas, also aliens. In the alternative, they argued that Chipstek and Expertek were indispensable parties under Rule 19 and that the court must dismiss the case under Rule 12(b)(7) because they were not joined. The court delayed ruling on this motion until after trial and denied it on February 3, 2009.

The jury trial began on January 21, 2009 and heard three days of testimony. At the close of both the plaintiff's and their own cases, the Lamas moved for judgment as a matter of law under Rule 50, citing insufficient evidence on all

11

claims. The court granted the motion in part. It dismissed the Count IV worthless check claim against all defendants because Molinos did not put forward evidence to pierce the corporate veil of either Chipstek or Expertek under an alter ego theory. It also refused to consider Molinos's alternative argument for Count IV—that Chipstek and Expertek were the Lamas' agents—because the court found that Molinos had never before raised that theory. The court also dismissed the Count V FDUTPA claim against Oscar Sr. because there was no evidence that he played any role in the issuance of the checks.

The court then submitted to the jury the Count I breach of contract claim and Count VI unjust enrichment claim against all defendants, and the Count V FDUPTA claim against Carlos and Oscar Jr. The jury found for Molinos and awarded $1.4 million on Count I and $636,596.00 on Count V. The district court subsequently entered a judgment for that amount, holding all defendants jointly and severally liable for the damages.

Shortly after the verdict, the Lamas again moved for judgment as a matter of law under Rule 50 and, alternatively, for a new trial under Rule 59. They first argued that there was insufficient evidence to show that Mejia was Oscar Sr.'s agent, either actual or apparent. The district court rejected this argument, finding that there was sufficient evidence to show that Oscar Sr. ratified Mejia's acts. The

12

district court rejected the Lamas' other arguments and allowed the verdict to stand, but modified the judgment to reflect Molinos's actual damages, $774,106.88, and net pre-judgment interest of $327,322.33.[9]

Both parties appealed. Molinos appealed the dismissal of its Count IV worthless check claim. The Lamas contested the subject matter jurisdiction ruling, challenged the court's admission of the purported settlement negotiations, argued that Mejia was not authorized to bind the Lamas under Count I, and argued that Carlos and Oscar Jr. were not liable under the FDUPTA under Count V.

At oral argument, the panel raised concerns regarding subject matter jurisdiction because it appeared that Carlos and Oscar Jr. might not be United States citizens. The parties submitted supplemental briefs on this issue. The Lamas presented copies of non-immigrant worker visas for both Carlos and Oscar Jr., as well as documentation proving that Oscar Sr. is a dual citizen of the United States and the Dominican Republic. In its supplemental reply brief, Molinos conceded that Carlos and Oscar Jr. are not United States citizens and therefore not proper parties in a diversity action brought by a foreign corporation (Molinos).[10]

_____

[9] Molinos agreed with the district court's re-assessed damages and does not challenge them on appeal.

[10] Molinos initially claimed, in its supplemental briefing to this court, that Carlos and Oscar Jr. were permanent residents of the United States and should be treated, for diversity purposes, as citizens of Florida under 28 U.S.C. § 1332(a), which states: "For the purposes of this section, . . . an alien admitted

13

It asked the court to dismiss Carlos and Oscar Jr. from the case and impose the full judgment solely against Oscar Sr.

## II.

Whether this court has subject matter jurisdiction is an issue of law that we review de novo. Miccosukee Tribe of Indians of Fla. v. United States, 619 F.3d 1286, 1288 (11th Cir. 2010). The parties now agree that Carlos and Oscar Jr. are not proper parties because they are Dominican citizens; their presence destroys full diversity under alienage jurisdiction. We must therefore vacate the judgment as it pertains to them.

Oscar Sr.'s status in this case remains contested. The Lamas raise three possible bars to this court's subject matter jurisdiction over the case as it pertains to Oscar Sr. First, they claim that Oscar Sr. is an improper party under 28 U.S.C. § 1332(a)(2) either because he is a dual citizen or because he is domiciled abroad. Second, because Carlos and Oscar Jr. are Dominican citizens, the Lamas argue that the district court never had jurisdiction to hear this case and that we must therefore vacate the judgment against Oscar Sr. and dismiss the entire case. Third,

---

to the United States for permanent residence shall be deemed a citizen of the State in which such alien is domiciled." 28 U.S.C. § 1332(a). Carlos's and Oscar Jr.'s non-immigrant worker visas demonstrate that they are not permanent residents; permanent resident aliens would not need visas to work in the United States. Molinos apparently accepted these documents as authentic and abandoned its argument to the contrary.

14

the Lamas argue that we should impute the Dominican citizenship of Chipstek and Expertek to the Lamas—destroying diversity—because Chipstek and Expertek were the real actors in this case. We address each argument in turn.

A.

Alienage jurisdiction is a form of diversity jurisdiction under which federal courts may hear cases between "citizens of a State and citizens or subjects of a foreign state." 28 U.S.C. § 1332(a)(2). Like the complete diversity rule in cases between citizens of different states, see Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 267, 2 L. Ed. 435 (1806), alienage jurisdiction prohibits an alien from suing another alien in federal court unless the suit includes United States citizens as plaintiffs and defendants, Iraola & CIA, S.A. v. Kimberly-Clark Corp., 232 F.3d 854, 860 (11th Cir. 2000). It is the burden of the party seeking federal jurisdiction to demonstrate that diversity exists by a preponderance of the evidence. McCormick v. Aderholt, 293 F.3d 1254, 1257 (11th Cir. 2002) (citing Scoggins v. Pollock, 727 F.2d 1025, 1026 (11th Cir. 1984)).

In this case, the plaintiff, Molinos, is a Dominican corporation. The parties now agree that two of the three co-defendants, Oscar Jr. and Carlos, are citizens of the Dominican Republic and therefore are not proper parties in this diversity action.

15

Oscar Sr., the third defendant, is a dual citizen of the United States and the Dominican Republic. Molinos contends that dual citizens are considered to be United States citizens for diversity jurisdiction. Oscar Sr. argues that his Dominican citizenship defeats diversity: an alien plaintiff would be suing an alien defendant. In the alternative, he argues that he was not a citizen of Florida.

Regarding Oscar Sr.'s first argument, this court has not explicitly determined whether aliens may sue individuals who are dual United States citizens under alienage jurisdiction. The courts of appeals deciding this issue have uniformly held that, for diversity purposes, courts should consider only the United States citizenship of individuals who are dual citizens. See, e.g., Sanchez v. Aerovias De Mex., S.A. De C.V., 590 F.3d 1027, 1028 n.1 (9th Cir. 2010); Frett-Smith v. Vanterpool, 511 F.3d 396, 399–400 (3d Cir. 2008); Coury v. Prot, 85 F.3d 244, 250 (5th Cir. 1996); Action S.A. v. Marc Rich & Co., 951 F.2d 504, 507 (2d Cir. 1991); Sadat v. Mertes, 615 F.2d 1176, 1187 (7th Cir. 1980); see also Von Dunser v. Aronoff, 915 F.2d 1071, 1073–76 (6th Cir. 1990) (agreeing with Sadat's reasoning, but finding no occasion to so hold because the facts regarding the parties' domicile was unclear and required remand); Las Vistas Villas, S.A. v. Petersen, 778 F. Supp. 1202, 1204 (M.D. Fla. 1991), aff'd 13 F.3d 409 (11th Cir. 1994).

16

We are persuaded by the reasoning of these courts and therefore hold that an individual who is a dual citizen of the United States and another nation is only a citizen of the United States for the purposes of diversity jurisdiction under § 1332(a).  Oscar Sr.'s Dominican citizenship therefore poses no bar to this court's jurisdiction.

Oscar Sr.'s second contention is that he is domiciled in the Dominican Republic and not domiciled in—and, hence, not a citizen of—Florida.[11]  He raises this possibility for the first time in his supplemental briefing: "[T]he record evidence demonstrates that Mr. Lama [Oscar Sr.] was living temporarily at an address in Florida, and that he had maintained various business interests in the Dominican Republic."  If true, this assertion would defeat diversity jurisdiction; U.S. citizens domiciled abroad are neither "citizens of a State" under § 1332(a) nor "citizens or subjects of a foreign state" and therefore are not proper parties to a diversity action in federal court.  Newman-Green, Inc. v. Alfonzo-Larrain, 490

---

[11]  Oscar Sr. does not explicitly argue that he is domiciled in the Dominican Republic.  His supplemental briefing discusses this topic in only one sentence.  It says: "[T]he record evidence demonstrates that Mr. Lama [Oscar Sr.] was living temporarily at an address in Florida, and that he had maintained various business interests in the Dominican Republic."  Because everyone, with few exceptions, has a domicile, this excerpt suggests that his true domicile lies in the Dominican Republic.

We also note that, under our normal waiver rules, we would not address this argument because of its cursory nature.  Oscar Sr. has presented neither facts nor law to support the sentence quoted above.  However, this issue raises questions of this court's jurisdiction, which we must consider if in doubt.

17

U.S. 826, 828–29, 109 S. Ct. 2218, 2221, 104 L. Ed. 2d 893 (1989).  Thus, our next question is whether Oscar Sr. is, in fact, domiciled in the State of Florida.

"For adults, domicile is established by physical presence in a place in connection with a certain state of mind concerning one's intent to remain there." Miss. Band of Choctaw Indians v. Holyfield, 490 U.S. 30, 48, 109 S. Ct. 1597, 1608, 104 L. Ed. 2d 29 (1989); see also Sunseri v. Macro Cellular Partners, 412 F.3d 1247, 1249 (11th Cir. 2005).  Domicile is not synonymous with residence; one may temporarily reside in one location, yet retain domicile in a previous residence.  Although physically present in the current residence, the person does not intend to remain in that state indefinitely.

The issue of Oscar Sr.'s domicile was never raised in the district court and our record on this topic is therefore lean.  What facts exist, however, satisfy us that Oscar Sr. is domiciled in Florida.

First, Oscar Sr. maintained throughout the litigation that he is "domiciled within the City of Aventura, Florida."  See Am. Answer and Affirmative Defenses to Am. Compl. ¶ 5; Joint Pretrial Stipulation 6.  His admission in the amended answer is noteworthy.  Molinos alleged only that Oscar Sr. was a "resident" of

Florida[12]; Oscar Sr.'s admission asserted not that he was merely a "resident" but that he was domiciled in Florida. Courts generally give little weight to a party's profession of domicile; they do so because these declarations are often self-serving. 13E Charles Alan Wright, Artuhur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3612, at 549 (3d ed. 2009). Here, however, quite the opposite is true. These admissions work against Oscar Sr.'s interest and thus carry evidentiary weight. See Fed. R. Evid. 801(d)(2)(A) (permitting hearsay statements by a party-opponent's own mouth or through her representatives); cf. Fed. R. Evid. 804(b)(3) (permitting hearsay from unavailable declarants if the statement "render[s] invalid a claim by the declarant against another [such that] a reasonable person in the declarant's position would not have made the statement unless believing it to be true").

Next, Oscar Sr.'s deposition testimony given pretrial suggests that he permanently resides—and thus is domiciled—in Florida. He states that he is "a permanent resident of the United States" and has resided in the United States for

---

[12] Ordinarily, the complaint must allege the citizenship, not residence, of the natural defendants. Taylor v. Appleton, 30 F.3d 1365, 1367 (11th Cir. 1994) ("Citizenship, not residence, is the key fact that must be alleged in the complaint to establish diversity for a natural person."). We need not dismiss the amended complaint, however. 28 U.S.C. § 1653 provides: "Defective allegations of jurisdiction may be amended, upon terms, in the trial or appellate courts." Because we read this provision liberally, see Toms v. Country Quality Meats, Inc., 610 F.2d 313, 316 (5th Cir. 1980), we will allow Oscar Sr.'s admissions and record evidence to cure Molinos's pleading defect.

"two to three years."[13]  When asked why he moved to the United States, Oscar Sr. replied, "Because I am retired.  I am a citizen and like the United States."  As a "permanent resident," Oscar Sr. suggests that he intends to reside in the United States permanently.  He lived in Aventura, Florida when Molinos filed this suit; we may presume that, until controverted by fact, he is domiciled at his current residence.  See Slaughter v. Toye Bros. Yellow Cab Co., 359 F.2d 954, 956 (5th Cir. 1966) (describing a "presumption of domicile in the jurisdiction where the party is a resident at the crucial time, which in this case is the time of the commencement of the action").[14]  Furthermore, Oscar Sr.'s retirement decreases the likelihood that his move to Florida was a temporary business arrangement.

Against this evidence, Oscar Sr. merely states that his residence in Florida was "temporary" and that he had continuing business interests in the Dominican Republic.  To prove this assertion, Oscar Sr. says only that "the record evidence demonstrates" his claim.

---

[13]  This statement came from Oscar Sr.'s interpreter.  The transcript reads:

Q.  How long have you lived [at your residence in Aventura]?
        THE INTERPRETER: He doesn't remember exactly since he came to the United States, two to three years.

[14]  The Eleventh Circuit adopted as binding precedent all holdings of the Fifth Circuit prior to October 1, 1981.  Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

The record before us refutes Oscar Sr.'s two claims. Regarding his "temporary" residence, his deposition testimony does state that he resides "[t]emporarily at 2600 Island Boulevard, Aventura, Florida." "Temporary" did not, however, mean that he was planning at some point to leave Florida. Rather, it was temporary because, as Oscar Sr. stated, "it is not my property. Somebody is loaning it to me and I am using it as long as I am provided with it." When asked whether he had a "permanent residence," he did not claim any city in the Dominican Republic; he was "a permanent resident of the United States" and "an American citizen."

Oscar Sr.'s purported Dominican business interests are similarly suspect. First, his deposition testimony states that he is "retired." Second, his trial testimony shows that, although he was on the board of directors of many companies,[15] these positions were "honorary" and required little effort on his part.

With the evidence before us, we are persuaded that Oscar Sr. is a citizen of Florida and therefore a proper defendant under § 1332(a)(2).

B.

---

[15] His trial testimony does not give the nationality of any of these companies. We will assume for the sake of argument that they are all Dominican.

We therefore turn to a more difficult question: must we dismiss the entire case and vacate the judgment for lack of subject matter jurisdiction because neither Carlos nor Oscar Jr. were proper parties?

An appellate court has the power under Rule 21 to rescue an otherwise valid judgment by dismissing non-diverse parties. Newman-Green, 490 U.S. at 832–37, 109 S. Ct. at 2222–25; Iraola, 232 F.3d at 860–61; see also Grupo Dataflux v. Atlas Global Group, L.P., 541 U.S. 567, 572–73, 124 S. Ct. 1920, 1925, 158 L. Ed. 2d 866 (2004) ("[C]ourts of appeals also have the authority to cure a jurisdictional defect by dismissing a dispensable nondiverse party."). The relevant portion of Rule 21 provides: "Misjoinder of parties is not a ground for dismissing an action. On motion or on its own, the court may at any time, on just terms, add or drop a party." Fed. R. Civ. P. 21.

In using this power, the United States Supreme Court has cautioned that we should do so "sparingly" and only if no party will be prejudiced by the dismissal. Newman-Green, 490 U.S. at 837–38, 109 S. Ct. at 2225. Against this caution, however, lies another command from the Supreme Court: "Once a diversity case has been tried in federal court, . . . considerations of finality, efficiency, and economy become overwhelming." Caterpillar, Inc. v. Lewis, 519 U.S. 61, 75, 117 S. Ct. 467, 476, 136 L. Ed. 2d 437 (1996) (emphasis added); see also

22

Newman-Green, 490 U.S. at 838, 109 S. Ct. at 2226 ("Nothing but a waste of time and resources would be engendered by remanding to the District Court or by forcing these parties to begin anew."). Keeping in mind that this case has already been to a jury trial, we commence our inquiry.

Two factors establish prejudice under the Newman-Green framework. We first determine whether the non-diverse party is indispensable under Rule 19. Newman-Green, 490 U.S. at 835, 109 S. Ct. at 2224. If the party is indispensable, then we must dismiss the entire case. See Fritz v. Am. Home Shield Corp., 751 F.2d 1152, 1155 (11th Cir. 1985) ("[The Plaintiff] apparently never requested the court to determine that [the non-diverse defendant] was not an indispensable party to the action under Rule 19, a finding that must be made before a Rule 21 dismissal of a nondiverse party is appropriate." (citing Ralli-Coney, Inc. v. Gates, 528 F.2d 572, 575 (5th Cir. 1976)). Next, we must inquire whether the presence of the non-diverse party provided the other side with a tactical advantage in the litigation. Newman-Green, 492 U.S. at 838, 109 S. Ct. at 2225.

Rule 19 provides the rules for mandatory joinder of parties. For our purposes, Rule 19 is a two-step inquiry. First, we determine whether the parties—here Carlos and Oscar Jr.—are "required" parties. Fed. R. Civ. P. 19(a); see also Temple v. Synthes Corp., 498 U.S. 5, 7, 111 S. Ct. 315, 316, 112 L. Ed.

23

2d 263 (1990). If they are required parties, but cannot be joined—i.e., because they are non-diverse—Rule 19(b) provides a list of factors to "determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed." Fed. R. Civ. P. 19(b).[16]

Assuming that Carlos and Oscar Jr. are required parties, Oscar Sr. has not shown that they are indispensable under Rule 19(b). The Rule provides:

> If a person who is required to be joined if feasible cannot be joined, the court must determine whether, in equity and good conscience, the action should proceed among the existing parties or should be dismissed. The factors for the court to consider include:
> (1) the extent to which a judgment rendered in the person's absence might prejudice that person or the existing parties;
> (2) the extent to which any prejudice could be lessened or avoided by:
> (A) protective provisions in the judgment;
> (B) shaping the relief; or
> (C) other measures;
> (3) whether a judgment rendered in the person's absence would be adequate; and
> (4) whether the plaintiff would have an adequate remedy if the action were dismissed for non-joinder.

Fed. R. Civ. P. 19(b). These factors are "not intended to exclude other considerations"; "pragmatic considerations" play a key role in our determination. Fed. R. Civ. P. 19 advisory committee's notes.

---

[16] It is in this sense that "indispensibility" is akin to prejudice.

Consideration (1) does not aid Oscar Sr. He claims prejudice because "he will be held liable on a contract of which there is no evidence that he had any part in the formation, based on the alleged acts of two individuals, also allegedly parties to the contract, which were never properly before the court." This argument is non-responsive to the inquiry. The advisory committee notes suggest that the prejudice involved relates to the judgment itself; "[w]ould any party be exposed to a fresh action by the absentee [party], and if so, how serious is the threat?" Fed. R. Civ. P. 19 advisory committee's notes. Oscar Sr. will not be required to breach any duties to Carlos or Oscar Jr. by paying money damages to Molinos.

Considerations (2) and (3) also weigh against dismissal. These provisions come into play when—unlike this case—litigants seek specific relief such as an injunction. In that context, if a party ultimately responsible for the plaintiff's woes is not present, the court cannot direct that party to change its behavior. See, e.g., Wymbs v. Republican State Exec. Comm. of Fla., 719 F.2d 1072, 1080 (11th Cir. 1983). Money damages lack these concerns. Money is fungible; the recipient cares not from whence it came. See Fed. R. Civ. P. 19 advisory committee's notes (stating that money damages in lieu of specific relief would alleviate adequacy concerns).

25

Available remedies, consideration (4), is contested by the parties. We need not address this issue, however, because yet another practical consideration weighs against dismissal. The federal courts have invested significant resources in this matter: fifteen months of proceedings in the district court and a full jury trial. This concern for conserving judicial resources, along with the above analysis, demonstrates that "equity and good conscience" do not require that we find Oscar Jr. and Carlos to be indispensable parties.

We also cannot find a tactical advantage gained here. Tactical advantages include access to otherwise unavailable discovery materials only because of the presence of the improper party. See Newman-Green, 490 U.S. at 838, 109 S. Ct. at 2225–26. Oscar Sr. has not pointed to any discovery Molinos would not have otherwise received or witnesses it could not have called; he concedes that Oscar Jr. and Carlos were within the court's subpoena power. Oscar Sr. contends that, because Carlos and Oscar Jr. were forced to testify on their own behalf, Molinos gained an advantage by questioning them on cross-examination rather than on direct examination. This concern is irrelevant; he does not claim that Carlos and Oscar Jr. would testify to different facts in this counterfactual.

Oscar Sr. also complains that he was prejudiced because most of the evidence at trial dealt with the conduct of Oscar Jr. and Carlos. This concern is

26

similarly irrelevant. The jury found Oscar Sr. liable for breaching the contract with Molinos. Were he tried separately, Molinos would present the same facts to the jury; Oscar Sr. has not pointed to any evidence that would be inadmissible or otherwise unavailable at this hypothetical trial. We cannot assume a different outcome without different facts.

We further note that, even if Oscar Sr. did suffer a tactical disadvantage, he had the power to remedy that issue. He, Oscar Jr., and Carlos were represented by the same counsel, who could have discovered that Oscar Jr. and Carlos were Dominican citizens. What is more, Oscar Sr. must have known his sons' immigration statuses. Had Oscar Sr. raised these jurisdiction concerns earlier in the district court—or even at all—we might be sympathetic; as he did not, we are not. See Ingram v. CSX Transp., Inc., 146 F.3d 858, 862–63 (11th Cir. 1998) ("[Prejudice concerns] might be persuasive where a litigant raises the jurisdictional issue at an earlier stage in the proceedings. [The litigant], however, waited until her oral argument presentation on appeal—long after the district court's adverse ruling on the merits of her case. We decline to reward such delay.").

Oscar Sr. will face no prejudice as the sole defendant in this case. We therefore use our Rule 21 power to dismiss Carlos and Oscar Jr. from this case and retain Oscar Sr.

C.

The Lamas—now just Oscar Sr.—challenge diversity on yet another ground. He claims that Molinos improperly omitted Chipstek and Expertek—the writers of the bad checks—as defendants because their Dominican citizenship would destroy complete diversity. Accordingly, he argues that we should either impute the Dominican citizenship to Oscar Sr. or that Chipstek and Expertek are an indispensable parties under Rule 19.[17]

Oscar Sr.'s imputation argument flows from a corporate-law analogy, citing a case from the Fifth Circuit, Freeman v. Northwest Acceptance Corp., 754 F.2d 553 (5th Cir. 1985). There, the plaintiff sought to hold a parent corporation liable for its subsidiary's actions on the theory that the subsidiary was the parent's alter ego—the same theory Molinos cited to hold Oscar Sr. liable under the Count IV

---

[17] The Lamas made both arguments before the district court. On appeal, however, it appears that the Lamas chose to focus solely on the Rule 19 argument. Under normal circumstances, the imputation argument would thus be waived. We will address this argument, however, out of an abundance of caution because, if meritorious, it could deprive this court of subject matter jurisdiction and thus the power to hear this appeal.

worthless check claim. See id. at 554–55. The court of appeals imputed the subsidiary's citizenship to the parent and in doing so destroyed complete diversity.

Two strands of corporate case law supported the court's ruling. First, consolidated corporations may, in certain circumstances, retain the citizenship of both pre-consolidated companies. Id. at 556 (citing John Mohr & Sons v. Apex Terminal Warehouses, Inc., 422 F.2d 638, 641 (7th Cir. 1970)). A second line of cases dealt with personal jurisdiction; the subsidiary's amenability to service of process would be imputed to the parent where the parent was sued for the subsidiary's actions. Id. at 557–58 (citations omitted). Essentially, the court looked to substance over form and imputed the subsidiary's citizenship to the parent as if it had incorporated in multiple states. Id. at 558.

The district court rejected this argument as applied to Molinos. First, the court noted that "Molinos . . . has looked at substance over form" and sued the actual party responsible for its harm—the Lamas. Second, the court refused to extend Freeman's parent-subsidiary imputation to suits against shareholders.

Regarding the Count I breach of contract claim, the district court's first basis is persuasive. Molinos alleged, and the jury believed, that the Lamas personally entered into a contract with Molinos via the Lamas' agent. Under these

29

terms, Chipstek and Expertek were not parties to the contract, and therefore not proper parties in this lawsuit.

We find the district court's second explanation persuasive as to the Count IV worthless check claim that Molinos presses on appeal. Freeman's logic is inapposite when applied to individuals.[18] Corporations are "citizens" for diversity purposes wherever they are incorporated and have their principal place of business. 28 U.S.C. § 1332(c)(1). As a result, corporations may be citizens of multiple states. Furthermore, corporations can merge and re-form themselves wherever and in as many states as they please. Individuals have no such parallel. They are only citizens of the state in which they are domiciled, McCormick v. Aderholt, 293 F.3d 1254, 1257–58 (11th Cir. 2002); see also 28 U.S.C. § 1332(a)(1), and they have only one domicile, 13E Charles A. Wright, et al., supra, § 3612, at 528. They cannot choose to split their identities and "incorporate" in a second state.

Freeman's analogy to personal jurisdiction is similarly unavailing. Every individual has but one domicile and is a citizen of only one state. That same individual, however, is amenable to process in any state in which the individual

---

[18] We have no opinion whether Freeman's holding is sound and should be followed by this Circuit. Rather, we merely hold that, whatever its validity elsewhere, it's logic does not apply to individuals.

maintains "minimum contacts." PVC Windoors, Inc. v. Babbitbay Beach Const., N.V., 598 F.3d 802, 807 (11th Cir. 2010). But having minimum contacts with one state does not change an individual's domicile. Cf. Sunseri, 412 F.3d at 1249 (defining domicile as one's "true, fixed and permanent home and principal establishment, and to which he has the intention of returning whenever he is absent therefrom" (citations omitted)). It therefore follows that, if an individual were conducting her business via a corporate shell, the corporation's minimum contacts would not, even if it could increase the number of states in which she could be sued, alter her domicile.

We therefore reject Oscar Sr.'s imputation argument. Instead, he must convince this court that Chipstek and Expertek are indispensable parties under Rule 19 and that the district court erred in failing to dismiss the case under Rule 12(b)(7).

As stated above, Rule 19 provides for mandatory joinder of "required" parties, whose absence will prejudice either the absent party or the litigants. Where the required party cannot be joined—because doing so would defeat subject matter jurisdiction—the court must determine whether the lawsuit can proceed without the party "in equity and good conscience." Fed. R. Civ. P. 19(b). The court must consider the prejudice suffered by the litigants, whether it can

31

shape relief to avoid prejudice, whether a judgment would be adequate, and whether the plaintiff would have an adequate remedy if the action were dismissed. Id. Again, these factors are not exclusive, and the court may consider other "pragmatic considerations." Id. advisory committee's notes.

The district court rejected the Lamas' Rule 19 argument principally because it was filed on the first day of trial. Although Rule 12(b)(7) motions may be raised even at trial, the late timing violated the district court's scheduling order because dispositive motions were due months earlier.

While we do not disagree with the district court's ruling, Oscar Sr.'s brief to this court provides a simpler basis with which to reject his argument: he does not articulate any reason why he or the absent parties would be prejudiced. As the party invoking Rule 19, it is his burden to demonstrate which Rule 19(b) factors required dismissal "in equity and good conscience." See Focus on the Family v. Pinellas Suncoast Transit Auth., 344 F.3d 1263, 1280 (11th Cir. 2003) ("However, [the moving party] has identified no reason why [the absent party] cannot be joined in this action [thus requiring dismissal under Rule 19(b)].").

His only colorable argument lies in a citation to relevant authority stating that the acting subsidiary is a necessary party when a plaintiff sues the parent corporation for the subsidiaries' actions. See, e.g., Freeman, 754 F.2d at 559.

Even here, his argument fails; the only binding precedent he cites, Dernick v.

Bralorne Resources, Ltd., 639 F.2d 196 (5th Cir. 1981), held that the subsidiary in

question was not indispensable. See id. at 199–200 (finding that the subsidiary

would not be harmed because the plaintiff's money damages against the parent

would not harm the subsidiary's title to the relevant property).

Chipstek and Expertek are not indispensable parties and we need not

dismiss this action under Rule 19. With the jurisdictional issues settled, we now

move to the merits of the parties' appeals.

III.

Molinos appeals the district court's January 26 order dismissing the Count

IV worthless check claim under Rule 50. The district court found that Molinos

had not presented sufficient evidence at trial to pierce the corporate veil of both

Chipstek and Expertek to hold the Lamas personally liable for the bad checks

issued under those corporate names. Rule 50 provides in relevant part:

> If a party has been fully heard on an issue during a jury trial and the
> court finds that a reasonable jury would not have a legally sufficient
> evidentiary basis to find for the party on that issue, the court may:
>     (A) resolve the issue against the party; and
>     (B) grant a motion for judgment as a matter of law
>     against the party on a claim or defense that, under the
>     controlling law, can be maintained or defeated only with
>     a favorable finding on that issue.

Fed. R. Civ. P. 50(a)(1). We review this claim de novo and consider the evidence in the light most favorable to the non-moving party. Abel v. Dubberly, 210 F.3d 1334, 1337 (11th Cir. 2000).

In deciding these claims, we are applying Florida's substantive law. See Erie R.R. Co. v. Tompkins, 304 U.S. 64, 78, 58 S. Ct. 817, 822, 82 L. Ed. 1188 (1938). Where the highest court—in this case, the Florida Supreme Court—has spoken on the topic, we follow its rule. Where that court has not spoken, however, we must predict how the highest court would decide this case. Guideone Elite Ins. Co. v. Old Cutler Presbyterian Church, Inc., 420 F.3d 1317, 1326 n.5 (11th Cir. 2005). Decisions of the intermediate appellate courts—here, the Florida District Courts of Appeal—provide data for this prediction. Bravo v. United States, 577 F.3d 1324, 1325 (11th Cir. 2009) (per curiam) (citing West v. Am. Tel. & Tel. Co., 311 U.S. 223, 237, 61 S. Ct. 179, 183, 85 L. Ed. 139 (1940)). As a general matter, we must follow the decisions of these intermediate courts. Allstate Life Ins. Co. v. Miller, 424 F.3d 1113, 1116 (11th Cir. 2005). But we may disregard these decisions if persuasive evidence demonstrates that the highest court would conclude otherwise. Id.

Here, piercing the corporate veil was necessary to hold Oscar Sr. and the Lamas liable for the worthless checks. Florida's worthless check statute, Fla. Stat.

34

§ 68.065, punishes the making or drawing of a bad check. But individual signers of corporate checks are not liable for those checks; the corporation remains liable. See Fla. Stat. § 673.4021(3). Chipstek and Expertek were the true "violators" of the worthless check statute. Molinos therefore sought to hold Oscar Sr. liable for Chipstek's and Expertek's actions by piercing the corporate veil under alter ego and agency theories.

Molinos challenges the district court's ruling on two fronts. First, Molinos argues that it did present sufficient evidence to pierce the veil under an alter ego theory. Second, it claims that it also presented evidence that Chipstek and Expertek were the Lamas' agents, and therefore we may impute the worthless check to them personally. We find neither of these arguments availing.

A.

On appeal, Molinos argues that the district court erroneously concluded that it did not present sufficient evidence to pierce the veils of Chipstek and Expertek under an alter ego theory. In the district court, Molinos claimed that the Lamas, Oscar Sr. included, controlled these corporations by virtue of their positions on the board of directors.[19] Molinos needed to pierce these veils because only Chipstek

---

[19] As stated earlier, see supra note 2, the record is unclear whether Oscar Sr. is also a shareholder in either of these companies. Molinos, however, only asserts that Oscar Sr. is liable by virtue of his director position; it clearly does not believe that Oscar Sr. is a shareholder. We will honor Molinos's wishes and disregard the possibility that Oscar Sr. is a shareholder of Chipstek or Expertek.

35

and Expertek, the signer of the checks, could be held liable under Florida's worthless check statute. The alter ego theory could work around this hurdle.

In retort, the Lamas argue that Molinos's veil piercing argument fails as a matter of law because the Lamas were not shareholders of either corporation; Globaltek owned the companies.[20] Although the Florida Supreme Court has never squarely answered this question, we predict that it would agree with the Lamas and reject Molinos's argument.

A corporation is a legal entity—a fictional person—capable of entering contracts and doing business in its own right. The purpose of this fiction is to limit the liability of the corporation's owners, whether it be individuals or other corporations. Finding this arrangement useful to commerce, the Florida courts will not easily disregard this fiction. See Roberts' Fish Farm v. Spencer, 153 So. 2d 718, 721 (Fla. 1963).

It is black letter law in Florida that to disregard this corporate fiction and hold the corporation's owners liable—to "pierce the corporate veil"—the plaintiff must prove that:

(1) the shareholder dominated and controlled the corporation to such an extent that the corporation's independent existence, was in fact

---

[20] The Lamas raise this argument for the first time on appeal. Were they the appellant for this claim, we would find the argument duly waived. However, we may affirm the district court's ruling on any ground supported by the record. Powers v. United States, 996 F.2d 1121, 1123–24 (11th Cir. 1993).

non-existent and the <u>shareholders</u> were in fact alter egos of the corporation;

(2) the corporate form must have been used fraudulently or for an improper purpose; and

(3) the fraudulent or improper use of the corporate form caused injury to the claimant.

<u>Gasparini v. Pordomingo</u>, 972 So. 2d 1053, 1055 (Fla. 3d Dist. Ct. App. 2008) (emphasis added) (citations omitted); <u>see also</u> 8A Fla. Jur. 2d Business Relationships § 13 (2008).  "Shareholders" include individuals who own stock, <u>see, e.g.</u>, <u>McCormack v. Ribbeck</u>, 702 So. 2d 271, 271–72 (Fla. 1st Dist. Ct. App. 1997), and parent companies who own their subsidiaries, <u>see, e.g.</u>, <u>17315 Collins Ave., LLC v. Fortune Dev. Sales Corp.</u>, 34 So. 3d 166, 168 (Fla. 3d Dist. Ct. App. 2010).

The theme of ownership underlies Florida's leading case on piercing the corporate veil, <u>Dania Jai-Alai Palace, Inc., v. Sykes</u>, 450 So. 2d 1114 (Fla. 1984). In <u>Sykes</u>, the plaintiff sued a parent company and its two subsidiaries.  Although only one of the subsidiaries committed the tort in question, the plaintiff alleged that the subsidiaries operated as one entity and that these subsidiaries were the "mere instrumentalities" of the parent, which should be liable for the subsidiary's actions.  <u>Id.</u> at 1116.  The trial court accepted this argument and the district court

of appeal affirmed, holding that the plaintiff need not prove any fraud or wrongdoing on the part of the parent corporation, the subsidiaries' owner.  Id.

The Florida Supreme Court rejected this understanding, and in doing so, based the rationale for piercing the veil on shareholder liability.  The court explained that shareholders incorporate to limit their liability, creating a separate entity that is "apart from its stockholders."  Id. at 1118 (quoting Riesen v. Md. Cas. Co., 14 So. 2d 197, 199 (Fla. 1943)).  Correspondingly, courts will not ignore this separate entity so long as the stockholders make "proper use" of this fiction; they must not use limited liability to defraud creditors.  Id. (citing Riesen, 14 So. 2d at 199; Barnes v. Liebig, 1 So. 2d 247, 253–54 (Fla. 1941)).  It is when shareholders "improperly disregard[] the corporate identities" that litigants may peel back the veil of limited liability and hold the corporation's owners responsible for its debts.  Id.

Syke's discussion of another seminal case, Mayer v. Eastwood-Smith & Co., 164 So. 684 (Fla. 1935), also emphasizes ownership.  In Mayer, the individual defendant loaned bonds to the corporation in exchange for 25 percent of the corporation's profits and held, as security, the corporation's stock.  Id. at 684–85.  As the Sykes court explained, the individual in Mayer was not liable because he

> owned none of the stock, held it only as security, <u>never made use or</u> <u>claimed ownership of the stock</u>, and did not commit any improper act. In other words, <u>[he] had no relationship with the corporation under</u> <u>any theory that would warrant holding him liable for the debts of the</u> <u>corporation</u> and had not committed any improper act.

<u>Sykes</u>, 450 So. 2d at 1118 (emphasis added).

Oscar Sr., the remaining defendant, did not own stock in Chipstek or Expertek. Globaltek owned the shares.[21] As stated above, normal veil piercing cases seek to hold the parent corporation—here Globaltek—liable, not the parent's shareholders or the subsidiary's officers. See <u>USP Real Estate Inv. Trust v.</u> <u>Discount Auto Parts, Inc.</u>, 570 So. 2d 386, 393 (Fla. 1st Dist. Ct. App. 1990).

Molinos contends, however, that this argument is a "contrived approach" to the law and that Florida permits suits against individuals who are not shareholders. Molinos cites two cases for this proposition. The first case, <u>In re Multiponics,</u> <u>Inc.</u>, 622 F.2d 709 (5th Cir. 1980), is inapposite because the individual was also the sole shareholder of the company in question, <u>id.</u> at 725.

Molinos cites one case that pierces the veil against a non-shareholder officer. <u>Walton v. Tomax Corp.</u>, 632 So. 2d 178, 181 n.2 (Fla. 5th Dist. Ct. App. 1994); <u>see also</u> <u>Bermil Corp. v. Sawyer</u>, 353 So. 2d 579, 584 (Fla. 3d Dist. Ct.

---

[21] Globaltek was in turn owned by ORLS International Holdings, which was in turn owned by L&S Corp., which was, finally, owned by the Lamas. Again, we follow Molinos's lead and disregard any potential shares Oscar Sr. may own in either Chipstek or Expertek. <u>See supra</u> note 2.

39

App. 1978) (holding similarly on similar facts, but not cited by Molinos). This case is distinguishable for two reasons. First, the corporation in question was not the subsidiary of another corporation. Second, the sole shareholder in that case was the defendant-officer's wife. Walton, 632 So. 2d at 179; see also Sawyer, 353 So. 2d at 582. The Florida Supreme Court would likely find that second fact dispositive; a wife's ownership is a very close analogue to the husband's ownership because the economic proceeds likely benefit the entire family unit. A separate corporate entity is nothing like a spouse.

Our research shows only one other case in which a Florida District Court of Appeal explicitly found a non-shareholder liable under a veil-piercing theory. Seminole Boatyard, Inc. v. Christoph, 715 So. 2d 987, 990 (Fla. 4th Dist. Ct. App. 1998). In Seminole, the individual held liable was also the president of the corporation in question. Id. at 988. It is not clear, however, that the individual was not also a stockholder. First, the court does not state who actually owned stock. Second, the court, in two different parts of the opinion, expresses the relevant law in terms of "shareholders." Id. at 989 ("If the state's law allows the debtor corporation to assert a claim against a controlling shareholder to pierce its own corporate veil, then the claim is property of the estate." (emphasis added)); id. at 990 (restating the black letter law for piercing the corporate veil in terms of

40

"shareholder" domination and control). And even if this individual did not own stock, we are confident that the Florida courts' emphasis on ownership would cause the Florida Supreme Court to pay this precedent little heed.

We therefore conclude that Florida law, as we predict the Florida Supreme Court would decide, does not permit a plaintiff to pierce the corporate veil against a non-shareholder director. If Molinos believed that Chipstek and Expertek were really sham entities, it should have sued Globaltek, not Oscar Sr.[22]

B.

Molinos's second issue on appeal argues that Chipstek and Expertek were the Lamas' agents, and that their actions should be imputed to Oscar Sr. The district court rejected this argument in its order granting the Lamas judgment as a matter of law on the Count IV worthless check claim. It found that Molinos had never before alleged that the two corporations were the Lamas' agents; the court refused to address the claim.

Rule 8 sets the standard for pleadings. It requires the plaintiff to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Rule 8(d)(2) permits the plaintiff to "set out 2 or

---

[22] Molinos could hypothetically hold Oscar Sr. liable by piercing the corporate veil through each corporation between Globaltek and Oscar Sr. However, Molinos does not pursue this theory.

more statements of a claim . . . alternatively or hypothetically, either in a single count or defense or in separate ones." If the evidence at trial brings to light a new theory of liability, the plaintiff may move the court to amend the pleadings if doing so would not prejudice the defendants. Fed. R. Civ. P. 15(b).

We agree with the district court that Molinos did not raise an agency theory in any of its court filings up until trial. The amended complaint only asserts the alter ego theory to hold the Lamas liable for Chipstek's and Expertek's actions. See Am. Compl. ¶ 21 ("At all material times to this Complaint, Molinos and the Lamas were well aware that these entities were in effect mere instrumentalities, alter egos, of the Lamas . . . ." (emphasis added)); id. ¶ 56 ("The Lamas, as herein described, utilizing several of their wholly controlled or wholly owned entities as their alter egos issued and caused to be issued to Molinos four checks totaling U.S. $636,596.00." (emphasis added)). Nowhere does it allege an agency relationship.

In opposing the Lamas' motion to dismiss, Molinos asserted the alter ego argument exclusively; it did not argue that the corporations were the Lamas' agents. See Pl.'s Mem. Opp'n to Def.'s Mot. to Dismiss 18 ("Defendants, who were personally liable to Plaintiff under the Foreign Currency Exchange Agreement, used Chipstek and Expertek as their alter egos."). In fact, the district

court explicitly credited the alter ego theory in denying the motion to dismiss. Order Defs.' Mot. to Dismiss 9.

Furthermore, the parties' Joint Pretrial Stipulation continued to assert—contrary to Molinos's argument to this court—an alter ego theory exclusively. In its statement of the case, Molinos states: "At no time during the numerous meetings and conversations held by representatives of Molinos and the Lamas personally, did the Lamas assert that . . . Chipstek and Expertek were not mere instrumentalities utilized to issue the worthless checks to Molinos." J. Pretrial Stipulation 4. Under its "contested issues," Molinos raised, "whether Defendants disregarded the corporate formalities and used Chipstek, S.A. and Expertek, S.A. as their mere instrumentalities." Id. at 7.

Molinos used the word "agent" for the first time at the January 22 hearing, defending against the Lamas' motion for judgment as a matter of law at the close of Molinos's case in chief. In passing, Molinos's counsel said, "We're arguing here from the outset that Chipstek and Expertek were mere agents of the Lamas. So, either under the alter ego theory or an agency theory, the real parties here were the Lamas." It appears again in Molinos's memorandum opposing the Lamas motion to dismiss for lack of subject matter jurisdiction. In both cases, the district court refused to address this issue because it was not raised earlier.

With the issue absent from Molinos's amended complaint, or any other court submission, Molinos needed to move to amend the complaint under Rule 15(b) to add the agency theory. It did not do so—either orally at trial or via a paper motion. We will therefore follow the district court's lead and refuse to consider the merits of Molinos's agency theory. Having rejected Molinos's claims on appeal, we now move to the issues raised in Oscar Sr.'s appeal.

IV.

The Lamas filed a separate appeal, contesting an evidentiary ruling and liability on both counts. As laid out in part II, Carlos and Oscar Jr. are no longer parties to this action. They must therefore be removed from the district court's judgment and the Count V, the FDUPTA count against only Carlos and Oscar Jr., must be dismissed.

The remaining issues impact Oscar Sr.'s liability regarding the Count I breach of contract action. The Lamas first fault the district court for admitting statements made by Oscar Sr. and Carlos during purported settlement negotiations in 2004 and 2006, violating Evidence Rule 408. They also claim that, this error notwithstanding, the evidence at trial was insufficient to prove that Mejia, the Lamas' currency broker, had authority to bind Oscar Sr. to the transaction. We address each argument in turn.

44

A.

Oscar Sr. first argues that the district court improperly admitted evidence of settlement discussions between him and Molinos, in violation of Evidence Rule 408. "We review a district court's ruling on the admissibility of evidence for abuse of discretion, and evidentiary rulings will be overturned only if the moving party establishes that the ruling resulted in a "substantial prejudicial effect." Piamba Cortes v. Am. Airlines, Inc., 177 F.3d 1272, 1305–06 (11th Cir. 1999) (citations omitted).

After Molinos learned that the Lamas' checks had bounced, the parties met to discuss the issue in August, September, and October of 2004, and again in 2006. At these discussions, the Lamas acknowledged the validity of the debt and the amount of the debt.[23]

The evidence at trial showed that Oscar Sr. was present at one of the meetings in 2004[24] and again in 2006. Molinos's witnesses testified that, during

---

[23] At the close of the 2004 negotiations, Carlos signed a promissory note, a "pague notorial," acknowledging that he was personally responsible for the debt. The promissory note was also the subject of the Lamas' evidentiary challenge, but, because it does not pertain to Oscar Sr., we will not discuss it here.

[24] Mejia testified that, after the checks bounced, he met with Oscar Sr., and that at this meeting, Oscar Sr. acknowledged that he was personally liable for the debt. It is not clear whether this discussion occurred in the context of the purported settlement negotiations or if this was merely a private discussion between Mejia and Oscar Sr. We assume for the sake of argument that this discussion took place in the context of settlement negotiations; otherwise, Evidence Rule 408 would not come into play.

45

these meetings, Oscar Sr. acknowledged that the debt was personal to him.[25]

Carlos, a frequent presence in these meetings, also acknowledged that the Lama family was liable for the debt; according to one witness, Carlos's references to his family included Oscar Sr. Molinos sought to use this evidence to prove that it was the Lamas personally, including Oscar Sr., and not Chipstek or Expertek, that were parties to the contract.

The Lamas moved in limine to exclude any evidence of these talks. Styling them "settlement negotiations," they sought to exclude these conversations under Evidence Rule 408. The court denied this motion, ruling that settlement negotiations would be admissible as circumstantial evidence to prove that the Lamas were parties to the contract, but not as an admission of liability. Furthermore, the court ruled that these discussions were not covered under Evidence Rule 408's proscriptions because neither the validity nor the amount of Molinos's claim was ever in dispute during these negotiations.[26]

Molinos's trial witnesses testified to statements made during the purported settlement negotiations. The court gave the jury this limiting instruction:

---

[25] Oscar Sr. also testified at trial and denied that he ever acknowledged the debt as personal.

[26] The motion in limine also sought to exclude evidence of side litigation between the parties in the Dominican Republic. The court excluded any settlement negotiations regarding that litigation, but distinguished between the those discussions and the 2004 and 2006 discussions described above.

You're going to hear evidence of meetings which occurred after the checks allegedly were returned for insufficient funds or because the account was closed.

That evidence is not admitted for the purpose of establishing an agreement on the part of the Lamas that they owed the debt, but it is admissible for other purposes; for instance, for you to determine with whom Molinos had an agreement, if anyone, with respect to the currency exchange and with respect to, for instance, whether there is any legal distinction that can be made between the Lamas themselves and the corporations with which they were involved.

The court clarified this order: "They can consider the evidence, though for the purpose of determining who were the parties to the currency exchange agreement and whether or not there is a legal distinction which can be made between the Lamas and Globaltek and these other corporations."

Evidence Rule 408 covers the admissibility of evidence of "compromise and offers to compromise":

(a) Prohibited uses. Evidence of the following is not admissible on behalf of any party, when offered to prove liability for, invalidity of, or amount of <u>a claim that was disputed as to validity or amount</u>, or to impeach through a prior inconsistent statement or contradiction:
 (1) furnishing or offering or promising to furnish—or accepting or offering or promising to accept—a valuable consideration in compromising or attempting to compromise the claim; and
 (2) conduct or statements made in compromise negotiations regarding the claim, except when offered in a criminal case and the negotiations related to a claim by a public office or agency in the exercise of regulatory, investigative, or enforcement authority.

(b) Permitted uses. This rule does not require exclusion if the evidence is offered for purposes not prohibited by subdivision (a). Examples of permissible purposes include proving a witness's bias or prejudice; negating a contention of undue delay; and proving an effort to obstruct a criminal investigation or prosecution.

Fed. R. Evid. 408 (emphasis added).

As the underlined text demonstrates, the claim must be disputed in some way before Evidence Rule 408's proscriptions take effect. See Fed. R. Evid. 408 advisory committee's notes ("The policy considerations which underlie the rule do not come into play when the effort is to induce a creditor to settle an admittedly due amount for a lesser sum. . . . Hence the rule requires that the claim be disputed as to either validity or amount."); 2 Weinstein's Federal Evidence § 408.06 (2d ed. 2010) ("The [Advisory Committee's] Note requires a careful distinction between a frank disclosure during the course of negotiations—such as, 'All right, I was negligent. Let's talk about damages' (inadmissible)— and the less common situation in which both the validity of the claim and the amount of damages are admitted—'Of course, I owe you the money, but unless you're willing to settle for less, you'll have to sue me for it' (admissible)."); see also Preis v. Lexington Ins. Co., 279 F. App'x 940, 942–43 (11th Cir. 2008); Dallis v. Aetna Life Ins. Co., 768 F.2d 1303, 1306–07 (11th Cir. 1985).

The district court found that the Lamas, including Oscar Sr., did not dispute the debt; they acknowledged its existence and that they were liable for its payment. This determination is a subsidiary finding of fact under Evidence Rule 104(a), Fed. R. Evid. 104(a) ("Preliminary questions concerning the . . . existence of a privilege or the admissibility of evidence shall be determined by the court . . . ."), and we may overturn this finding only for clear error, City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 556 (11th Cir. 1998). We find no such error here and correspondingly find that the district court did not abuse its discretion in admitting the purported settlement negotiations.

B.

Oscar Sr. also contends that Molinos did not present sufficient evidence to hold him liable for Mejia's actions. The district court found that Molinos presented sufficient evidence to show that Oscar Sr. ratified Mejia's actions when he personally acknowledged the debt to Mejia. On appeal, Oscar Sr. argues that Mejia had neither the apparent authority to engage in the transaction on his behalf, nor was there evidence that he ratified Mejia's actions and therefore assumed

49

liability.[27]  We agree with the district court that Oscar Sr. may be liable under a ratification theory.[28]

"Ratification of an agreement occurs where a person expressly or impliedly adopts an act or contract entered into in his or her behalf by another without authority."  Deutsche Credit Corp. v. Peninger, 603 So. 2d 57, 58 (Fla. 5th Dist. Ct. App. 1992) (citations omitted).  The principal must have full knowledge of the initially unauthorized agents' conduct and approve of that conduct.  Frankenmuth Mut. Ins. Co. v. Magaha, 769 So. 2d 1012, 1021–22 (Fla. 2000).

Molinos presented sufficient evidence to prove an explicit ratification.  It presented evidence of a conversation between Mejia and Oscar Sr. during which Oscar Sr. committed himself to the contract.  Mejia testified,

> I requested to go see Oscar Lama, Sr., the father, and he received me and he told me not to have any doubt whatsoever; that they would personally solve that problem; that I had worked with them in his bank, and that I was aware of his financial and moral solvency; and that under no circumstance would they look bad on anyone, even though he had to use his reserves for his old age.

[27]  Molinos's counsel stipulated that Oscar Sr. did not grant Mejia express authority to enter the contract.

[28]  Oscar Sr. also contends that the ratification issue was a new theory presented for the first time at trial and that we cannot consider this claim because Molinos did not move to amend its complaint at trial under Fed. R. Civ. P. 15(b).  The district court implicitly rejected this argument in its March 19, 2009 ruling on the motion for judgment as a matter of law.  From the pleadings, we see this as fairly presented and find no reason to disturb the district court's judgment.  As subpart III.B, supra, demonstrated, the district court was perfectly capable of preventing Molinos from arguing new theories raised for the first time at trial; the court's failure to rule similarly on this issue speaks volumes.

When asked whether Oscar Sr. "indicate[d] that these checks would be made good personally by the Lama family," Mejia answered in the affirmative. He again stated this point on cross-examination.[29]

Other testimony provided circumstantial evidence for this proposition. Bonnelly, Molinos's currency broker, testified that she had previously done business with the Lamas, including the father; she had never done business with Expertek or Chipstek. She testified: "Every time I do business with them, I would do business with the Lamas; that is, the father, Oscar, and the son, Carlos Lama." She further testified that Carlos Lama indicated that the Lama family, including Oscar Sr., would cover the bad checks. Reynoso also testified that Oscar Sr. did not deny liability for the checks during the 2006 meeting. Although this fact alone might not have established liability, it provides yet another inference in favor of holding Oscar Sr. liable.

Against this argument, Oscar Sr. claims that he cannot be liable because he did not accept any benefit from the contract. This argument suffers from two flaws, one conceptual and one factual. Conceptually, the Florida case law refers to acceptance of benefits to prove ratification where there is no proof of explicit

---

[29] The transcript reads:
Q. Sir, I want to focus on Oscar R. Lama for a moment, the father. Now if I understood your testimony yesterday, is it your testimony that he was part of this transaction?
A. That's what he told me.

ratification.  The case Oscar Sr. cites states, "Ratification, as applied to the law of agency, is the adoption or affirmance by a principal of the acts of his agent, either expressly, as by a written act, <u>or impliedly, as by acceptance of the benefits of the contract</u>." <u>Spurrier v. United Bank</u>, 359 So. 2d 908, 910 (Fla. 1st Dist. Ct. App. 1978) (emphasis added) (citation and internal quotation marks omitted).  This passage suggests that when, as here, the principal explicitly ratifies the agent's work, the plaintiff need not prove that the principal retained an improper benefit.

Factually, his argument also fails.  Oscar Sr. claims that, because Molinos never introduced evidence that its funds went directly to Oscar Sr.'s bank account, the jury could not reasonably find that Oscar Sr. benefitted from the transaction.  Here, Molinos fulfilled its side of the contract by writing checks payable to several third parties, at the direction of the Lamas' broker, Mejia.  Mejia, in turn, explained that the Lamas often requested that the checks be payable to their messengers, who would cash the checks right away; on this occasion, he believed that several checks were payable to these messengers.  When combined with testimony that the Lamas were the real principals to the transaction, a jury could reasonably conclude that the messengers completed their tasks and transported the check proceeds to the Lamas, including Oscar Sr.

V.

We **AFFIRM** the district court's judgment as to Oscar Sr., but **VACATE** the judgment as to Carlos and Oscar Jr.

**SO ORDERED.**