[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 18-10557

_____

D.C. Docket No. 4:09-cv-00172-WTM-GRS

KARINE MAIER,
as surviving spouse of James R. Maier,
and as Executrix of the Estate of James R. Maier,

Plaintiff-Appellant,

versus

GREEN EYES USA, INC.,
FAUSTINO JIMENEZ, et al,

Defendants-Appellees.

_____

No. 19-11966

_____

D.C. Docket No. 4:09-cv-00172-WTM-GRS

KARINE L. MAIER,

Plaintiff-Appellant,

versus

FAUSTINO JIMENEZ,

Defendant-Appellee.

_____

Appeals from the United States District Court
for the Southern District of Georgia

_____

(February 5, 2021)

Before BRANCH, LUCK, and ED CARNES, Circuit Judges.

PER CURIAM:

James Maier was standing on the shoulder of Interstate 95 beside his disabled car when a semi-truck struck and killed him.  The truck was driven by Faustino Jimenez, an employee of a trucking company called Green Eyes USA, Inc.  Karine Maier,[1] James' widow and the executrix of his estate, sued Green Eyes, Jimenez, and a number of insurers, including Canal Insurance Company and Shelly, Middlebrooks & O'Leary, Inc., for James' wrongful death.

This case has a complex procedural history but presents three straightforward legal issues.  First, whether we have appellate jurisdiction over the district court's interlocutory grant of summary judgment to Canal and Shelly.  Second, whether the district court erred in finding Jimenez was a citizen of Florida, in which case there

_____

[1] For clarity, we refer to Karine Maier as "Maier" and to James Maier as "James."

2

is a lack of complete diversity and a lack subject matter jurisdiction. And third, assuming we have appellate jurisdiction and that there is subject matter jurisdiction, whether the district court's grant of summary judgment was proper. Maier contends that we have appellate jurisdiction but that subject matter jurisdiction is lacking and asks us to order the case remanded to state court. We will not do that because we have appellate jurisdiction and there is subject matter jurisdiction. The district court's grant of summary judgment is due to be affirmed.

## I.    FACTS AND PROCEDURAL HISTORY

Because this case took a long and winding road to us, we start by explaining how it got here.

## A. The Accident and Maier's Lawsuit

In October 2008 James was driving north on I-95 near Savannah when car problems forced him to pull to the side of the road. He was standing in the emergency lane next to his disabled car when a semi-tractor-trailer truck crossed into his lane, striking and killing him. Jimenez was driving the truck, which Green Eyes owned.

Maier filed a wrongful death lawsuit against Green Eyes and Jimenez in Georgia state court in February 2009. She amended her complaint in October 2009 to add four new defendants, including Canal, which had insured Green Eyes until six months before the accident, and Shelly, Canal's agent. The amended complaint

3

alleged that Jimenez was a resident of Florida, that he was not competent to safely operate a tractor trailer as evidenced by his history of traffic violations, that Canal and Shelly knew or should have known Jimenez wasn't competent because they undertook to perform driving record inquiries for Green Eyes, and that Canal and Shelly were liable for James' wrongful death pursuant to Restatement (Second) of Torts § 324A(a), (c).

Canal and Shelly removed the case to the Southern District of Georgia in November 2009, alleging that Maier was a citizen of Georgia, Jimenez was a resident of Florida, and diversity jurisdiction applied. After Maier amended her complaint a second time in February 2010 to add three new defendants, one of those defendants filed for bankruptcy, which stayed the case until May 2010. Maier joined a tenth defendant in September 2010.

Canal and Shelly moved for summary judgment in January 2011, arguing that Maier's Restatement § 324A(a) claim failed because their actions — labeling potential Green Eyes drivers as "acceptable," "unacceptable," or "acceptable with a surcharge" — did not increase any risk of harm to James, and that her § 324A(c) claim failed because she had not shown that Green Eyes changed its position by neglecting or reducing its own safety program in reliance on those actions. The district court granted that motion in September 2011.

The next month, Maier, Canal, and Shelly all filed motions asking the district

4

court to certify the grant of summary judgment as a final judgment under Federal Rule of Civil Procedure 54(b). The court denied those motions in August 2012, noting that final judgment under Rule 54(b) generally "is proper only after rights and liabilities of all parties to an action have been adjudicated." Eleven days later the district court stayed the case again after learning that another defendant had filed for bankruptcy. The court noted that its order staying the case did not prevent Maier from dismissing her claims against any defendant, including those in bankruptcy.

The case had been stayed for two years when Maier moved in September 2014 to dismiss all six of the remaining defendants under Federal Rule of Civil Procedure 41(a)(2). She also requested that the district court enter a final judgment under Rule 54 as to Canal and Shelly so that she could appeal the grant of summary judgment in their favor. The court dismissed her remaining claims without prejudice under Rule 41(a)(2) in September 2015. Although the court did not address Maier's Rule 54 request regarding Canal and Shelly, it did express its view that its earlier order granting summary judgment to Canal and Shelly had "effectively become[] the . . . final judgment in this case."

### B. Maier's First Appeal and Attempts to Secure a Final Judgment

Maier appealed the district court's order granting summary judgment to Canal and Shelly "as made the final judgment" by the court's September 2015 order

5

dismissing her remaining claims under Rule 41(a)(2).  We issued jurisdictional questions asking the parties "under what theory" the September 2015 order was final or appealable and also whether the record established the parties' citizenship for purposes of diversity jurisdiction.

After the parties briefed the issue, we dismissed Maier's appeal for lack of jurisdiction in February 2016, concluding that the September 2015 order dismissing her remaining claims under Rule 41(a)(2) was "not a final, appealable order."  We did not address the citizenship question.

Maier, in search of a path to appellate review, tried three times to have the district court enter a final, appealable order.  First, in June 2016, she moved the court to amend the September 2015 order under either Rule 54(b) or Rule 60(b). The court denied that motion because it lacked jurisdiction to enter a Rule 54(b) order retroactively and it could not use Rule 60(b) to amend a non-final order.

Second, in December 2016, Maier moved the district court to reopen the case, reinstate the claims it had dismissed without prejudice, dismiss those claims with prejudice, reaffirm its grant of summary judgment to Canal and Shelly, and re-close the case for purposes of appeal.  The district court denied that motion, stating that it could not reinstate any claims until Maier provided more information about the status of the bankruptcies that had required the earlier stays.

Third, in June 2017, Maier for a second time moved to reopen, explaining

6

that the bankruptcy proceedings were closed and that her claims had been disposed of in those proceedings.  She asked the court to reinstate her claims against the non-bankrupt defendants and to dismiss those claims with prejudice "so that she may have a final, appealable judgment."  In each of her three attempts to convince the district court to convert the dismissals without prejudice into dismissals with prejudice, Maier also asked the court to reaffirm its grant of summary judgment against Canal and Shelly or to enter a final judgment as to them.

In January 2018, the district court denied Maier's second motion to reopen, the one she had filed in June 2017.  Citing the former Fifth Circuit's decision in Ryan v. Occidental Petroleum Corp., 577 F.2d 298, 303 (5th Cir. 1978), the court noted that "a partial entry of summary judgment followed by a voluntary dismissal of all remaining claims without prejudice does not create an appealable final judgment."  Although it acknowledged the "finality trap" Maier had fallen into, the court found there was no mechanism under either the Rules of Civil Procedure or our precedent that allowed it to reopen her claims and dismiss them with prejudice. The court concluded that it had relinquished jurisdiction over the claims once they were voluntarily dismissed under Rule 41(a) and couldn't revive them "simply at [Maier]'s request."

C. Maier's Second Appeal, Our Remand to District Court, and Her Third Appeal

Maier appealed the district court's January 2018 order denying her second

7

motion to reopen. That was her second appeal to us, and in it we reissued the jurisdictional question that went unanswered during her first appeal: whether the record established Jimenez's citizenship so as to invoke diversity jurisdiction.

Following the parties' responses, we concluded that the pleadings did not adequately allege either Jimenez's or James' citizenship and that the record was insufficient to show Jimenez's citizenship. We remanded to the district court to make factual determinations about Jimenez's citizenship at the time of removal and James' citizenship at the time of his death. We authorized the district court to permit discovery and hold hearings as appropriate and asked it to return the supplemented record to us.

On remand, the district court found that the existing record established that James was domiciled in Georgia at the time of his death, but it was insufficient to establish Jimenez's citizenship. After allowing limited discovery and briefing, the court reiterated in a May 2019 order that James was a citizen of Georgia, and it found that Jimenez was domiciled in Florida at the time of removal. Maier appealed the May 2019 order, which was her third appeal to us. We consolidated Maier's second and third appeals, and we consider them both now.

## II.    OUR JURISDICTION

In her third appeal, Maier challenges our subject matter jurisdiction on the basis that the parties lack complete diversity. But before we can address that

challenge, we have to decide whether we have appellate jurisdiction. We must start with that because if we do not have appellate jurisdiction, "we cannot review whether a judgment is defective, not even where the asserted defect is that the district court lacked jurisdiction." United States v. Machado, 465 F.3d 1301, 1306 (11th Cir. 2006).

## A. Appellate Jurisdiction

28 U.S.C. § 1291 gives us "jurisdiction of appeals from all final decisions of the district courts of the United States." That "is the basis for the final judgment rule, which ordinarily requires that all claims and issues in a case be adjudicated before appeal." State Treasurer v. Barry, 168 F.3d 8, 11 (11th Cir. 1999).

This is not the first time we have considered whether we have appellate jurisdiction over the order Maier appeals from. Last time we dismissed Maier's appeal for lack of jurisdiction because we concluded that the order she appealed from — her Rule 41(a)(2) voluntary dismissal of her remaining claims after the district court's interlocutory grant of summary judgment to Canal and Shelly — was not final and appealable. Nothing has changed in the facts or procedural history of this case since that time, so common sense might suggest that we still lack appellate jurisdiction. But common sense doesn't account for new precedent, and new precedent is precisely what we have in this case.

A month after oral argument in this case, a panel of this Court issued a

9

decision holding that "an order granting a motion to voluntarily dismiss the remainder of a complaint under Rule 41(a)(2) 'qualifies as a final judgment for purposes of appeal.'" Corley v. Long-Lewis, Inc., 965 F.3d 1222, 1231 (11th Cir. 2020) (quoting McGregor v. Bd. of Comm'rs, 956 F.2d 1017, 1020 (11th Cir. 1992)). Applying Corley, it would appear that we now have jurisdiction to review the denial of Maier's second motion to reopen, which was her third attempt to convince the district court to convert her Rule 41(a)(2) voluntary dismissal without prejudice into a dismissal with prejudice and final judgment.

But Canal and Shelly contend that we are "jurisdictionally limited" for another reason. They argue that even if we have appellate jurisdiction to review the denial of her motion to reopen, we lack jurisdiction to review the district court's earlier grant of summary judgment because Maier's second notice of appeal mentioned only the denial of the motion to reopen and not the summary judgment order. And under Federal Rule of Appellate Procedure 3(c)(1)(B), the appellant's notice of appeal must "designate the judgment, order, or part thereof being appealed."

That argument takes too constrictive a view. The Supreme Court has told us it is "entirely contrary to the spirit of the Federal Rules" to avoid deciding the merits of an appeal because of defects in appellate materials, which the Court called "mere technicalities." Foman v. Davis, 371 U.S. 178, 181 (1962). Instead, we

10

should give effect to an appellant's "manifest" intention and review whatever order she meant to challenge unless doing so would "mislead or prejudice" the appellee. Id.

As we've noted, this is Maier's second appeal. Canal and Shelly were parties to her first appeal; they've been along for the whole ride. And the entire time Maier's "intention to seek review of" the summary judgment order has been "manifest." Id. Canal and Shelly were not misled or prejudiced by her second notice of appeal's failure to mention that order by name.[2] See id.

Because Maier's second motion to reopen asked the district court to modify Maier's Rule 41(a)(2) voluntary dismissals without prejudice to create a final judgment, we have jurisdiction to review the court's denial of that motion. See Corley, 965 F.3d at 1231. And because "the appeal from a final judgment draws in question all prior non-final orders and rulings which produced the judgment," Barfield v. Brierton, 883 F.2d 923, 930 (11th Cir. 1989), we also have jurisdiction to review the court's interlocutory grant of summary judgment to Canal and Shelly.

## B. Subject Matter Jurisdiction

Now that Maier has succeeded in invoking our appellate jurisdiction, she questions subject matter jurisdiction. She contends that Canal and Shelly, who removed her lawsuit to federal court, failed to establish Jimenez's citizenship, so

---

[2] Canal and Shelly's motion to dismiss Maier's second appeal is DENIED.

11

the case must be remanded to state court because the parties are not completely

diverse.  We disagree.[3]

"A party removing a case to federal court based on diversity of citizenship

bears the burden of establishing the citizenship of the parties."  Rolling Greens

MHP, L.P. v. Comcast SCH Holdings L.L.C., 374 F.3d 1020, 1022 (11th Cir.

2004).  "Citizenship, not residence, is the key fact that must be alleged in the

complaint to establish diversity for a natural person."  Taylor v. Appleton, 30 F.3d

1365, 1367 (11th Cir. 1994).  "Citizenship is equivalent to 'domicile' for purposes

of diversity jurisdiction."  McCormick v. Aderholt, 293 F.3d 1254, 1257 (11th Cir.

2002).  "And domicile requires both residence in a state and an intention to remain

there indefinitely."  Travaglio v. Am. Express Co., 735 F.3d 1266, 1269 (11th Cir.

2013) (quotation marks omitted).  We review a district court's "jurisdictional

factfindings" only for clear error, id., and we will not disturb a domicile finding

unless we are "left with the definite and firm conviction that a mistake has been

committed," Scoggins v. Pollock, 727 F.2d 1025, 1027 (11th Cir. 1984) (quotation

marks omitted).

As mentioned, we remanded Maier's second appeal to the district court to

---

[3] And in her first appeal, Maier disagreed too.  She told us in her response to our jurisdictional questions in that appeal that Jimenez was domiciled in and a citizen of Florida, making him diverse from her. She also told us that she consented to Canal and Shelly's motion to amend their pleadings to allege that Jimenez was domiciled in and thus a citizen of Florida. And she also told us that there "is absolutely no evidence in the record that Jimenez has ever resided outside the state of Florida, or for that matter Miami."  How things (and minds) change.

make factual determinations about diversity of citizenship.  The district court found

that James was a citizen of Georgia at the time of his death and, after limited

discovery, it found that Jimenez was a citizen of Florida at the time of removal.

The record showed that Jimenez had a Florida driver's license that was renewed in

2006; he listed a Florida address when he applied for a job with Green Eyes; and he

worked for Green Eyes, which listed his home terminal as being in Florida.  In

addition to that, Jimenez's daughter gave a sworn declaration stating that at the time

Jimenez had "resided continuously in Florida since" 1999, had "never taken up

residence outside of Florida," had not "indicated an intent to reside anywhere

outside of Florida," still resided in Florida, and had recently suffered a stroke that

"affected his ability to communicate."

In her third appeal, Maier argues that Jimenez's direct testimony is necessary

to establish his intent to remain at a certain residence, that his daughter's

declaration is unauthenticated and insufficient, and that Jimenez may have been in a

Georgia jail at the time of removal.

Those arguments fail.  A party is not required to testify directly about his

citizenship.  In fact, "[c]ourts generally give little weight to a party's profession of

domicile; they do so because these declarations are often self-serving."  Molinos

Valle Del Cibao, C. por A. v. Lama, 633 F.3d 1330, 1342 (11th Cir. 2011).  As to

the declaration of Jimenez's daughter, the district court found "no legitimate reason

13

to doubt its authenticity" because it was "given under penalty of perjury," and the court credited the declaration's statement that it was based on the daughter's personal knowledge.  Because we "do not re-weigh or re-examine the credibility choices made by the fact finder," Kelliher v. Veneman, 313 F.3d 1270, 1277 (11th Cir. 2002), we defer to the district court's finding that the statements in the declaration were credible.  As for Jimenez's possible incarceration in Georgia at the time of removal, even assuming that's true, a prisoner is a citizen of the state where he was domiciled before incarceration, which would have been Florida.  See Mitchell v. Brown & Williamson Tobacco Corp., 294 F.3d 1309, 1314 (11th Cir. 2002).

We are not left with the definite and firm conviction that a mistake was committed by the district court in finding that Jimenez was a citizen of Florida at the time of removal.  Scoggins, 727 F.2d at 1027.  There was complete diversity.[4] See Travaglio, 735 F.3d at 1269; McCormick, 293 F.3d at 1257.  Federal subject matter jurisdiction exists.

### III.    THE SUMMARY JUDGMENT DECISION

Maier contends that the district court erred in granting summary judgment to Canal and Shelly on her claims against them.  She argues that Canal and Shelly owed her a duty under the Restatement (Second) of Torts § 324A, which Georgia

---

[4] Canal and Shelly's motion to dismiss Jimenez as a dispensable party is DENIED.

14

courts have adopted, and that they are liable under subsections (a) and (c) of that section.

We review de novo summary judgment orders, drawing all factual inferences and viewing all evidence in the light most favorable to the non-moving party. Craig v. Floyd Cnty., 643 F.3d 1306, 1309 (11th Cir. 2011). "Summary judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Id. (quoting Fed. R. Civ. P. 56(a)).

> Under § 324A, which is sometimes known as the Good Samaritan doctrine:
>
> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of a third person or his things, is subject to liability to the third person for physical harm resulting from his failure to exercise reasonable care to protect his undertaking, if (a) his failure to exercise reasonable care increases the risk of such harm, or (b) he has undertaken to perform a duty owed by the other to the third person, or (c) the harm is suffered because of reliance of the other or the third person upon the undertaking.

Huggins v. Aetna Cas. & Sur. Co., 264 S.E.2d 191, 192 (Ga. 1980); see also Howell v. United States, 932 F.2d 915, 918 (11th Cir. 1991).

For purposes of § 324A(a), a risk is increased only "when a nonhazardous condition is made hazardous through the negligence of a person who changed its condition or caused it to be changed." Howell, 932 F.2d at 919 (quotation marks omitted). "[F]ailing to take all possible actions to prevent an occurrence is not the

15

same as increasing the risk of the occurrence." Dale v. Keith Built Homes, Inc., 620 S.E.2d 455, 456 (Ga. App. 2005). And for purposes of § 324A(c), Georgia law requires that reliance be shown by a change in position. Phillips v. Liberty Mut. Ins. Co., 813 F.2d 1173, 1175 (11th Cir. 1987). Evidence that a company has "neglected or reduced its safety practices" because of a third party's actions can show such a change in position. Id.

### A. Restatement § 324A(a): Increased Risk of Harm

Maier argues that Canal and Shelly are liable under § 324A(a) for increasing the risk of harm to James by failing to exercise reasonable care in reviewing Jimenez's driving record and in approving him as a driver for Green Eyes. She asserts that they ignored Green Eyes' hiring criteria during their review and allowed Jimenez to be hired with motor vehicle violations that, had the criteria been applied, would have disqualified him. The obstacle to recovery for Maier is that, under Georgia law, a defendant is not liable simply because he could have prevented an accident but did not.

Both our own decisions and those of the Georgia state courts bear that out. In Howell, an FAA inspector learned that a plane's fuel was contaminated but did nothing to stop the plane from flying. 932 F.2d at 917. The plane crashed two days later because of the bad fuel. Id. We held that the inspector's "failure to ground the plane, issue a notice, or initiate an investigation did not increase the risk of harm"

16

for purposes of § 324A because he had not changed the condition of the plane or the fuel.  Id. at 918–19.  And in Dale, a company was sued after one of its employees drank on its job site, drove under the influence of alcohol, and struck a child.  620 S.E.2d at 456.  The plaintiffs argued that the company's failure to enforce its no-drinking policy increased the risk of harm.  Id.  The Georgia Court of Appeals rejected that argument:

> The plaintiffs essentially argue that it was incumbent upon [the company] to decrease the risk of harm to others by enforcing its no-drinking policy. This, however, is not the law; failing to take all possible actions to prevent an occurrence is not the same as increasing the risk of the occurrence.

Id. at 456–57 (quotation marks omitted).

As Howell and Dale make clear, Canal and Shelly did not have a duty to decrease the risk of harm to others in their review of motor vehicle records for Green Eyes.  Canal and Shelly's knowledge of Jimenez's violations, like the inspector's knowledge of the bad fuel in Howell, did not trigger an obligation to act. Their review of the motor vehicle records changed nothing about Jimenez's violation history, and it did not make a nonhazardous condition into a hazardous one.  See Howell, 932 F.2d at 919.  The district court's grant of summary judgment to Canal and Shelly on Maier's § 324A(a) claim was appropriate.

## B.  Restatement § 324A(c): Reliance

Maier argues that Canal and Shelly are liable under § 324A(c) because Green

17

Eyes relied on their evaluation of Jimenez's motor vehicle records when it decided to hire him. She argues it "can be inferred that Green Eyes, in reliance on Shelly and Canal obtaining and evaluating drivers' [motor vehicle records], changed its position and/or otherwise failed to follow its safety program" in three ways: (1) by changing its hiring practices after purchasing the Canal insurance policy; (2) by failing to request drivers' motor vehicle records, including for Jimenez, to evaluate them according to its hiring criteria; and (3) by failing to send Jimenez to its separate compliance company for processing, despite repeated notices from that compliance company to do so before James was killed.

1. Change in Green Eyes' Hiring Practices After Purchasing Canal Policy

In support of her contention that Green Eyes changed its hiring practices, Maier points to a series of communications between Shelly, Canal, and Green Eyes' CEO in October 2007. After Shelly sent Canal an email asking if they needed to charge for a Green Eyes' employee's accident, Canal responded: "It appears that the insured's hiring practices have changed. If he continues in this trend, [Canal] will have to re-evaluate." Shelly then alerted another agent that Canal might have to "reevaluate this risk." Green Eyes' CEO responded to Canal by assuring it that he would "not allow any[]more drivers with at fault accidents, [m]ajor speeding or more than 2 minor violation[s] on [his] policy" and that he wanted to "work together with [Canal] to be a claim free Company with an excellent safety Record."

18

Maier argues that these communications are "evidence that Green Eyes' hiring practices changed after obtaining coverage through Canal."

It's true those communications suggest that Canal thought Green Eyes' hiring practices may have changed. But they do not disclose how or why they changed, and Maier points to no other evidence that does either. She has not explained what Green Eyes' hiring practices were before it contracted with Canal and Shelly, so we cannot determine whether or why those practices changed after it contracted with Canal and Shelly.

If anything, the record evidence indicates that the change in Green Eyes' hiring practices, if there was any, was unrelated to its contract with Canal and Shelly. First, Green Eyes filed its articles of incorporation on August 8, 2007 and purchased its policy with Canal 21 days later. So it is unclear whether Green Eyes even had an established hiring practice before it contracted with Canal and Shelly. And Maier points to no evidence that it did. The record contains no motor vehicle reports produced before Green Eyes contracted with Canal and Shelly, and there is no other evidence that Green Eyes conducted any investigation at all into the safety records of its drivers during those first 21 days of its existence.

Second, Jimenez began driving for Green Eyes before Canal and Shelly

19

approved him as a driver for insurance purposes.[5]  So there is evidence that Green Eyes made its hiring decisions without regard to what Canal and Shelly did with the motor vehicle records and that Canal's and Shelly's review of those records was only to determine whether they were willing to insure Green Eyes' proposed drivers.

Third, on March 17, 2008 — two days before Canal approved Jimenez, three days before Shelly approved him, and a month before the contract between Green Eyes, Canal, and Shelly ended — Green Eyes hired a different company to ensure its compliance with Department of Transportation regulations, which includes driver safety standards.  So there is evidence that Green Eyes was undertaking its own hiring related safety initiatives independent of Canal and Shelly's evaluation of its drivers' motor vehicle records.

With that record evidence (or lack thereof) in mind, the communications between Shelly, Canal, and Green Eyes referencing Green Eyes' hiring practices appear to be nothing more than an insurance agency warning one of its clients that it was hiring risky drivers and that the client needed to tighten its standards, and the

---

[5] The Green Eyes employee who was "in charge of processing truck drivers who were applying for employment" swore in her affidavit that when she requested insurance approval for Jimenez on the morning of March 19, 2008, Green Eyes "had already been using Mr. Jimenez as a truck driver prior to seeking coverage for him."  He was approved as an insured driver by Canal on March 19 and by Shelly on March 20.

20

client in response, attempting to save its insurance policy, saying that it would be more careful about the drivers it hired.  Even viewed in the light most favorable to Maier, there is no genuine issue of material fact about whether Green Eyes changed its hiring process in reliance on Canal's and Shelly's services after purchasing the Canal policy — there is not a single piece of evidence that it did.  And if Green Eyes did not change its position, there is no § 324A(c) liability.  See Phillips, 813 F.2d at 1174–75.

### 2. Green Eyes' Failure to Request and Evaluate Motor Vehicle Records After Hiring Canal and Shelly

Maier next argues that it "can be inferred from the evidence that Green Eyes was sending drivers with more violations on their driving records to Canal and Shelly for review because Green Eyes had stopped evaluating tractor-trailer drivers' [motor vehicle records], in reliance upon Canal and Shelly doing so."  But Maier points to nothing in the record to support that inference.  Her brief contains no citations to anywhere in the record showing that Green Eyes ever obtained a motor vehicle record for an employee before its contract with Canal and Shelly, and she doesn't even argue that it did.

Instead, Maier argues only that Green Eyes failed to request and evaluate driver motor vehicle records according to its hiring criteria.  But if Green Eyes did not request and evaluate its drivers' motor vehicle records before it contracted with Canal and Shelly, then it did not change its position by continuing that practice after

21

it contracted with Canal and Shelly.  And again, if Green Eyes did not change its position, there is no § 324A(c) liability.  See Phillips, 813 F.2d at 1174–75.

### 3.  Green Eyes' Failure to Have Jimenez Processed By Its Separate Compliance Company

Finally, Maier argues "a jury could conclude that Green Eyes changed its position and reduced its safety activities[] by not sending Jimenez to [its separate compliance company] to be evaluated, in reliance upon Shelly and Canal having already evaluated and approved him."  But again, she points to no evidence a jury could use to reach that conclusion.  She does not cite a record document in which Green Eyes indicates to the compliance company that it is not sending Jimenez for an evaluation, despite the company's "repeated notices" that he needed to be evaluated, because Canal and Shelly had already reviewed his motor vehicle record. Nor does Maier identify any evidence that Green Eyes failed to have a driver's records checked by the compliance company because they had already been checked by Canal and Shelly.

The record does show that Green Eyes hired the separate compliance company to ensure its compliance with DOT regulations, including driver safety standards, after Green Eyes had contracted with Canal and Shelly and before its contract with Canal and Shelly ended.  That Green Eyes — while it was still covered by Canal and Shelly — hired a separate company to evaluate its drivers' motor vehicle records for safety indicates that it was not relying on Canal and

22

Shelly to perform that task.  Because nothing in the record shows that Green Eyes'
failure to have Jimenez evaluated by its compliance company had anything to do
with Canal and Shelly, there is no genuine issue of material fact that Green Eyes
changed its position or reduced its safety activities in reliance on them.  No change
in position equals no § 324A(c) liability.  See Phillips, 813 F.2d at 1174–75.

## IV.    CONCLUSION

Because we have both appellate and subject matter jurisdiction, we can
decide whether the district court's erred in granting summary judgment to Canal
and Shelly.  It didn't.  As the district court determined, the evidence establishes
without genuine issue that "Green Eyes' safety program was lacking from the very
beginning"; it was always "poor and noncompliant" and "continued to be
substandard before, during, and after" Green Eyes' business relationship with Canal
and Shelly.  As a result, the district court was correct in its conclusion that Canal
and Shelly did not increase the risk of harm to James and that Green Eyes did not
change its position in reliance on Canal and Shelly.

**AFFIRMED.**