**FOR PUBLICATION**

In the

# United States Court of Appeals

## For the Eleventh Circuit

————————————————

No. 24-14186

————————————————

ICARE CHILD DEVELOPMENT CENTER LLC,
LAUREN DAVIS,

*Plaintiffs-Appellants,*

*versus*

ALETHEA CICERO-BROWN,

Georgia Department of Early Care and Learning
Legal Services Officer, in her individual capacity,

ALEISHA GOLDEN,

Georgia Department of Early Care and Learning
Compliance Manager, in her individual capacity,

AMY M. JACOBS,

Georgia Department of Early Care and Learning
Commissioner, in her individual capacity,

ELISABETTA KASFIR,

Georgia Department of Early Care and Learning
Commissioner of Federal Programs, in her
individual capacity, et al.,

*Defendants-Appellees.*

————————————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:24-cv-02291-SEG

————————————————

Before WILLIAM PRYOR, Chief Judge, ABUDU, Circuit Judge, and
CONWAY,[*] District Judge.

WILLIAM PRYOR, Chief Judge:

This interlocutory appeal requires us to decide whether a daycare provider dismissed from a childcare voucher program is entitled to a preliminary injunction reinstating it. In 2023, the Georgia Department of Early Care and Learning conducted simultaneous site visits to four of iCare Childcare Center's daycares. The auditors requested arrival and departure records. After only one of the four centers provided the requested records, the Department dismissed iCare from the voucher program. iCare sued officials and moved for a preliminary injunction reinstating it in the program. It argued it was entitled to a pre-deprivation hearing under the Due Process Clause of the Fourteenth Amendment. The district court denied the preliminary injunction. Because iCare was not entitled to a pre-deprivation hearing, we affirm.

## I. BACKGROUND

We describe the background of this appeal in three parts. First, we describe the Georgia childcare voucher program. Second,

———————————————

[*] The Honorable Anne C. Conway, United States District Judge for the Middle District of Florida, sitting by designation.

we explain the circumstances that led to iCare's dismissal from the program. Finally, we describe the proceedings in the district court.

*A. Georgia's Childcare Voucher Program.*

Georgia administers a voucher program called the Childcare and Parent Services Program. Funded primarily by a federal grant, *see* Child Care and Development Block Grant Act of 1990, Pub. L. No. 101-508, § 5082, 104 Stat. 1388-236 (codified as amended at 42 U.S.C. §§ 9857–9858r), the program provides "child care certificate[s]" to low-income families who may redeem them "as payment for child care services," 42 U.S.C. §§ 9858c(c)(2)(A)(i)(II), 9858n(2). The Georgia Department of Early Care and Learning is responsible for administering the program.

To accept voucher certificates, childcare providers must sign a provider agreement. The agreement requires that providers maintain "arrival and departure records" for each child enrolled at a daycare. It further states that the Department "may request documents in writing or in person for attendance verification assessments, compliance reviews, or investigations." In the event of "an on-site review, the provider . . . must immediately make records available." And the "Adverse Actions" section of the agreement states that "[p]roviders will be dismissed . . . [w]hen they fail to comply with an investigation."

In addition to the provider agreement, providers must also comply with a policy manual, which provides a "right to appeal and

receive a hearing regarding [Department] actions resulting in a re-claim of funds." Policy Manual § 18.4.1. But the manual states that dismissal, disqualification, or denial from participation as a pro-gram provider is unappealable. *Id.* For those actions, a provider may submit a grievance, which is "handled at the State Office level and reviewed by impartial members of [the program's] leadership." *Id.* § 17.1. The policy manual does not guarantee any procedures for resolving grievances, except that "staff will review [grievances] and make contact as necessary with applicable parties within five business days to reach a resolution as quickly as possible." *Id.* § 17.3.4.

### B. The Department's Dismissal of iCare From the Program.

iCare is a chain of childcare centers in Georgia. When it filed this suit, it had eight locations. Many of iCare's students—up to 100 percent at some locations—received voucher certificates.

On October 24, 2023, the Department conducted simultane-ous on-site reviews at four of iCare's locations. The parties dispute what prompted the audits. The Department says it audited several childcare providers, including iCare, after an internal investigation revealed that one of the Department's employees was approving voucher applications in exchange for cash. For its part, iCare asserts that the audits were retaliatory after iCare's director, Lauren Davis, complained about incorrect payments.

When the auditors arrived, they requested arrival and depar-ture records. Davis says she "ma[d]e every effort to attend to the auditors' records requests," but the Department says Davis was

"highly resistant" and demanded the auditors leave before they had completed their review. Nevertheless, the parties agree that three of the four centers audited "were unable to compile all of the requested records during the onsite audit."

Two days later, Davis emailed the Department and "offered to provide the remainder of the requested records if given a reasonable amount of additional time to do so." The Department rejected her request because the provider agreement required providers "to maintain arrival and departure logs" for immediate inspection, "th[ose] records could be altered with additional time," and iCare "knowing[ly] refus[ed] to cooperate with the audit." Davis then filed a grievance about the "planned and coordinated raid[s]" and suggested that they were "retaliatory." The Department responded that someone from its audits and compliance team would contact her, but no one did.

On November 9, 2023, the Department informed Davis that it would dismiss all iCare centers from the program because iCare "failed to cooperate with a request for records during an onsite interview." The dismissal letter stated that the voucher certificates assigned to iCare would expire on November 19, 2023. It also stated that iCare could not appeal.

iCare attempted to appeal the dismissal. On November 13, Davis and her counsel met with the Department's chief legal officer, Ira Sudman, who told them iCare "was under investigation" but did not provide any details. Davis's counsel followed up with an email contesting iCare's dismissal and asking various questions.

Another Department official, Alethea Cicero-Brown, responded that "iCare was dismissed from the . . . program due to programmatic violations," that providers "ha[ve] no right to participate in the . . . program," and that iCare was not entitled to an appeal because, under the policy manual, only "actions resulting in a reclaim of funds" are appealable. Davis continued to press for an appeal, and Sudman responded that iCare's dismissal was "final" and not "an appealable action." On February 27, 2024, Davis's counsel sent a final letter requesting an appeal. Cicero-Brown responded that dismissal from the program was not appealable and that iCare was not constitutionally entitled to a hearing because it lacked a property interest in continued participation as a program provider.

While iCare contested its dismissal, it allowed program beneficiaries to remain enrolled for no charge. But Davis eventually closed or leased to other providers all but three of iCare's locations. According to Davis, the Department has refused to allow the lessees of her closed centers to participate in the program. She says her business "ha[s] operated at a loss," and she has struggled to pay her mortgage, business loans, and a $2.6 million tax bill for 2023. And she says the Department owes her at least $242,550 in payments from before iCare was dismissed.

### C. District Court Proceedings.

iCare sued several Department officials and alleged a violation of due process under the Fourteenth Amendment, *see* 42 U.S.C. § 1983, and state tort claims. iCare moved for a preliminary injunction for reinstatement in the program on the ground that it

24-14186                Opinion of the Court                7

was constitutionally entitled to notice and a pre-deprivation hearing. The district court denied iCare's motion. Although it ruled that iCare would likely suffer irreparable injury absent an injunction, it ruled that iCare was unlikely to succeed on the merits of its due process claim because it lacked a property interest in continuing as a program provider. The district court also ruled that the public interest and balance of harms favored the Department.

## II. STANDARDS OF REVIEW

"We review the denial of a preliminary injunction for abuse of discretion." *Mills v. Hamm*, 102 F.4th 1245, 1248 (11th Cir. 2024). "We review legal conclusions *de novo* and factual findings for clear error." *Id.*

## III. DISCUSSION

To obtain a preliminary injunction, a movant must establish "a substantial likelihood of success on the merits," that "it will suffer an irreparable injury unless the injunction is granted," that "the harm from the threatened injury outweighs the harm the injunction would cause the opposing party," and that "the injunction would not be adverse to the public interest." *Gonzalez v. Governor of Ga.*, 978 F.3d 1266, 1270–71 (11th Cir. 2020). "Failure to show any of the four factors is fatal." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009). We address only iCare's likelihood of success on the merits, which is dispositive.

iCare is unlikely to succeed on the merits of its due process claim. To succeed on this claim, iCare must establish that it had a property interest in continued participation in the program and

that it was entitled to a hearing before dismissal. *See Bradshaw v. FAA*, 8 F.4th 1215, 1224 (11th Cir. 2021). Although the district court ruled that iCare lacked a property interest in continuing as a program provider, "we may affirm the district court's ruling on any ground supported by the record." *Molinos Valle Del Cibao, C. por A. v. Lama*, 633 F.3d 1330, 1349 n.20 (11th Cir. 2011). We assume without deciding that iCare has a property interest. But we conclude that iCare was not due a pre-deprivation hearing.

To determine whether a hearing is constitutionally required, we apply the balancing test in *Mathews v. Eldridge*, 424 U.S. 319 (1976). Under that test, we weigh three factors: (1) "the private interest that will be affected by the official action," (2) "the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," and (3) "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Id.* at 335. We tailor our inquiry to the type of termination at issue—here, dismissal for failure to comply with an on-site investigation. *See id.* at 336. And we focus on the procedures applicable "to the generality of cases, not the rare exceptions." *Id.* at 344. In weighing these factors, we are mindful of "the ordinary principle . . . that something less than an evidentiary hearing is sufficient prior to adverse administrative action." *Id.* at 343.

We begin with the first factor, the "private interest" at stake. *Id.* at 335. The strength of a party's private interest in receiving a

government benefit generally depends on the consequences of a deprivation. For example, in *Goldberg v. Kelly*, the Supreme Court concluded that welfare recipients have an extremely strong interest in receiving benefits because those benefits are "the very means by which [they] live." 397 U.S. 254, 264 (1970). And in *Mathews*, the Court said that "[e]ligibility for disability benefits, in contrast, is not based upon financial need. Indeed, it is wholly unrelated to the worker's income or support from many other sources . . .." 424 U.S. at 340–41. Even less significant is a physician's interest in providing a specific procedure when he has not suffered "an inability to practice medicine" generally, *cf. Shahawy v. Harrison*, 778 F.2d 636, 642–43 (11th Cir. 1985), or in treating Medicare patients when he may "still obtain revenue from the care of private patients," *Northlake Cmty. Hosp. v. United States*, 654 F.2d 1234, 1242 (7th Cir. 1981).

iCare concedes that its interest in continuing as a program provider is "[p]erhaps" less significant than that of the welfare recipients in *Goldberg*. We also conclude a dismissed provider's interest is less significant than the disability recipients in *Mathews*, who were likely to have "modest resources" and would be "unable to engage in substantial gainful activity" if truly disabled. 424 U.S. at 341–42 (citation and internal quotation marks omitted). Instead, a dismissed provider's interest is analogous to that of the physicians in *Shahawy* and *Northlake*. To be sure, dismissal from the program may substantially diminish a provider's revenue, as was the case for iCare. But dismissal from the program ordinarily does not affect a provider's childcare license, so a dismissed provider may continue to operate its daycares and "obtain revenue from the care of" non-

program beneficiaries. *Northlake*, 654 F.2d at 1242. Indeed, iCare continues to operate three daycares.

The second factor, "the risk of an erroneous deprivation . . . through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards," favors the Department. *Mathews*, 424 U.S. at 335. True, iCare's pre-dismissal process was not comprehensive: it received 10 days' notice before its certificates expired and was granted an informal meeting with the Department's chief legal officer during that period. But we agree with the Department that the risk of erroneous dismissal from a provider's failure to comply with an on-site investigation is "negligible." That risk is particularly low where the dismissal turns on "the yes-or-no question of whether a provider kept and provided proper records." For example, iCare concedes that it failed to provide the required records. Absent a dispute about the "factual basis" for the dismissal, we cannot see how a pre-deprivation hearing would "serve to protect any substantive rights," and requiring a hearing "would be unlikely to have significant value in reducing the number of erroneous deprivations." *Dixon v. Love*, 431 U.S. 105, 114 (1977).

iCare argues its dismissal involved more than its admitted failure to comply with the on-site investigations. For instance, it points to language in the Department's brief describing iCare's violation as "willful" and stating that iCare "is credibly suspected of fraud." And it argues that the veracity of those allegations can best

be determined through an in-person hearing. But "fail[ure] to comply with an investigation," intentional or not, is mandatory grounds for dismissal. So an opportunity to contest the Department's other allegations in a pre-dismissal hearing would not move the needle for iCare.

Finally, we consider "the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews*, 424 U.S. at 335. Because the "primary purpose of arrival and departure records . . . is to account for each child in care and to protect the health and safety of children," Policy Manual § 15.3.3, the Department has a significant interest in promptly dismissing providers that fail to maintain these records. iCare responds that "[t]here is no evidence . . . that [it] did anything other than provide a safe, supportive environment for children in its care." But the Department is entitled to adapt its procedures to the "generality of cases, not the rare exceptions." *Mathews*, 424 U.S. at 344.

The Department also has an interest in conserving resources. In *Mathews*, the Supreme Court acknowledged the Social Security Administration's interest in avoiding "the incremental cost resulting from the increased number of hearings and the expense of providing benefits to ineligible recipients pending decision." *Id.* at 347. The Court recognized that "the cost of protecting those . . . found undeserving may in the end come out of the pockets of the deserving." *Id.* at 348. The same considerations apply here. The Department explained that it seeks both to reduce the "public time

and resources necessary to supplement existing procedures" and to prevent a noncompliant provider from "continu[ing to] draw[] on the public fisc" while proceedings are pending.

On balance, the *Mathews* factors weigh against requiring a pre-deprivation hearing. To be sure, if iCare has a property interest in continuing as a program provider, perhaps it would be due more process than it received. *See id*. at 333, 339, 349 (explaining that the Supreme Court has "consistently . . . held that some form of hearing is required before an individual is finally deprived of a property interest" and emphasizing that the individuals whose disability benefits were terminated could obtain a post-deprivation hearing). But in this appeal, we must decide the narrow issue whether iCare is entitled to a preliminary injunction reinstating it in the program. That remedy would be appropriate only if iCare were entitled to a pre-deprivation hearing. *See Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) ("[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."). Because iCare is not entitled to a pre-deprivation hearing, it is not entitled to its requested preliminary injunction.

### IV. CONCLUSION

We **AFFIRM** the denial of the preliminary injunction.